[Civ. No. 50641. Second Dist., Div. Four. May 3, 1979.]

CONWAY J. FUHRMAN, Plaintiff and Appellant, v.
LEE RISNER et al., Defendants and Respondents.

**COUNSEL**

Jacque Boyle for Plaintiff and Appellant.

Brill, Hunt, Debuys & Burby, Michael T. Fox, Demetriou & Del Guercio, Richard A. Del Guercio, Richards, Watson, Dreyfuss & Gershon, Glenn R. Watson, Mitchell E. Abbott and Gary L. Gillig for Defendants and Respondents.

## OPINION

**JEFFERSON (Bernard), J.**—This is an action for libel. Plaintiff Conway J. Fuhrman, a former city councilman of Seal Beach, sought damages by a second amended and supplemental complaint which alleged the loss of his good name and reputation. Defendants were Good Government Group of Seal Beach, College Park Homeowners Association of Seal Beach, and many named individual citizens of Seal Beach. Plaintiff also alleged a cause of action for conspiracy, and sought special damages of $10,000 minimum, general damages of $500,000 and $500,000 as exemplary damages.

Various defendants made motions for summary judgment. Three different motions were granted with judgments rendered and entered accordingly. Plaintiff filed two notices of appeal from these judgments, and, since the same issues were involved in both appeals, they have been consolidated for review here.[1]

During the progression of this litigation, and while these appeals were pending, another similarly situated former city councilman, Hogard, seeking damages for the same claimed defamation, had successfully opposed defendants' motions for summary judgment at the trial level. The Hogard defendants petitioned for a writ of mandate to compel the entry of summary judgment in that case. The California Supreme Court agreed to review the matter and rendered its decision on November 27, 1978, in the case of *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672 [150 Cal.Rptr. 258, 586 P.2d 572]. The court held that summary judgment had properly been denied below, as triable issues of fact did exist; the peremptory writ of mandate was accordingly denied.[2]

The case at bench derives from the same facts, involves many of the same defendants, and raises essentially the same legal issues resolved by the Supreme Court in the Hogard litigation. Since that is the situation, our factual summary, discussion and disposition of these appeals will be brief.

### I

#### The Factual Background

The record reveals that this litigation arose during the course of intense political warfare which embroiled the City of Seal Beach during the years 1970 and 1971.

---

[1] The appeal has been dismissed as to one defendant, Risner.
[2] The *Good Government* decision was by a divided court.

In 1970, plaintiff Fuhrman was a city councilman, serving on a five-man council which included the mayor. During his tenure, which ended in March 1971, with his recall from office, he participated in a series of decisions by voting with two other councilmen, Baum and Hogard; these actions enraged certain members of two civic groups named in the complaint and referred to here as Good Government and College Park Homeowners, and possibly others. Within a short period of time, both the city manager and the city attorney had been fired, an attempt to recall plaintiff Fuhrman had been stymied—temporarily at least—and the dispute over recall and other matters expanded to include the city treasurer and the city clerk with involvement of the grand jury and the superior court.

The events which led to the assertedly defamatory publication upon which this lawsuit is based occurred in October and November of 1970. Prior to October 30, 1970, the city had issued building permits to R & B Development Company, which planned to build in the city some apartments for "swinging singles." However, on October 30, 1970, the city council majority, of which plaintiff Fuhrman was a member, revoked these permits and enacted a moratorium-on-building ordinance, which temporarily suspended construction activities at the proposed project site, for the expressed purpose of obtaining an environmental impact study.

R & B Development filed a lawsuit against the city. On November 23, 1970, at an executive session of the city council, councilmen Baum, Hogard and plaintiff Fuhrman declared that the dispute with the developer could be settled by payment to the city of a $100,000 "environmental tax" by the developer, and by termination of the pending litigation. The developer agreed to this, and also agreed to welcome married couples as well as single persons to the apartment complex. One of the councilmen who was not a member of the majority, Holden, expressed the view that these maneuvers amounted to "outright extortion" and "blackmail," but the majority prevailed and announced the terms of the transaction at a public meeting.

In February 1971, an article appeared in the College Park Homeowners newsletter, denouncing Baum, Hogard and Fuhrman. The article had been written by an officer of the Good Government group, and was widely distributed as a flyer throughout the community, even after a retraction of the article was published in early March 1971, in a March newsletter that announced a March 10, 1971, meeting. The article was severely critical of the councilmen, speaking of their "chicanery and machinations," and describing their conduct as "infamy."

The most offensive language, however, referred to the councilmen, including plaintiff Fuhrman, as members of "the same combine which extorted by blackmail $100,000.00 from the R & B Development Company. For its thirty pieces of silver the combine agreed to forego its concern for the City's ecology, pollution and strain on our sanitation system that Baum had so sanctimoniously raised during his campaign and in City Council meetings. For economical reasons the R & B Development Company submitted to the 'holdup' and agreed to drop its multi-million dollar suit against the City so that it could begin the construction of apartment buildings in the downtown section of the City."

Another member of the Seal Beach City Council, Gummere, resigned and the recall election of plaintiff Fuhrman was scheduled for March 30, 1971. As indicated, in early March 1971, a retraction appeared in the College Park Homeowners newsletter concerning the charges contained in the edition of the previous month. However, before the recall election, plaintiff filed this action for libel, alleging that, prior to the publication of the February newsletter he had been a city councilman who enjoyed a good reputation in the community of Seal Beach; that the retraction was not complete; that after the publication he had lost his good reputation, and had sustained damages thereby.

Subsequent amendments to the complaint alleged that plaintiff had indeed been recalled by the electorate at the recall election of March 30, 1971; that he had been ostracized publicly and privately in the community, and had been unable to find employment in the area. The discovery proceedings which followed did not disclose any critical factual discrepancies but narrowed the issues to a determination of whether plaintiff had stated sufficient facts to present the matter to a jury, despite the protected position afforded to citizens engaging in public expressions critical of a public official by the First Amendment to the United States Constitution and relied upon by the defendants. As indicated previously, the trial court granted summary judgments to defendants in reliance upon recognition of First Amendment rights as expressed in the leading case of *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], and its progeny.

II

*Triable Issues in Summary Judgment*
*Proceeding in a Libel Action.*

At issue on these appeals is whether the trial court properly determined that no triable issues existed in the case. Such determination

necessarily involved a finding that the published language was not libelous as a matter of law. The purpose of summary judgment proceedings and the principles which apply when such a judgment is sought have become well established in the decisional law and no detailed exposition is required here. (See Code Civ. Proc., § 437c; *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310]; *DeSuza* v. *Andersack* (1976) 63 Cal.App.3d 694, 698 [133 Cal.Rptr. 920].) ■ Summary judgment is regarded as a drastic remedy, disposing as it does of litigation without trial, and may only be invoked when it appears clearly that no triable issues exist. In keeping with this consideration, the affidavits and declarations of the moving party are strictly construed and those of the opponent—in this case, plaintiff Fuhrman—are afforded liberal construction.

■ We note also, however, that since libel actions, particularly those brought by public officials as the result of assertedly defamatory comment on their official conduct, involve the exercise of First Amendment rights, "speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy, and upon such a motion the trial court must determine whether there is a sufficient showing of malice to warrant submission of that issue to the jury." (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d 672, 685.)

■ In the case at bench, we have examined the declarations and counterdeclarations filed in the trial court, and have concluded that the trial court's determination must be assessed in light of the reasoning of the majority in the *Good Government* case, as we are compelled to follow it. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) We briefly analyze that opinion. In *Good Government,* the court adopts the principles set forth in *New York Times* v. *Sullivan, supra,* i.e., that "a public official may not recover damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice. That term was defined as knowledge by the defendant that the statement was false or reckless disregard of whether it was false." (*Good Government, supra,* 22 Cal.3d 672, 680.)

In *Good Government,* the publication in question raised two questions to which the majority addressed itself: (1) Whether the statements made constituted expressions of opinion (which would be protected) or expressions of fact (which would not be protected), and (2) Whether a

sufficient showing of malice had been made to justify the conclusion that the issue must be decided by a jury.

With respect to the opinion-fact distinction, the opinion noted that "[a]n allegedly defamatory statement may constitute a fact in one context but an opinion in another, depending upon the nature and content of the communication taken as a whole." (*Good Government, supra,* 22 Cal.3d 672, 680.) However, the court concluded that the words "recalcitrant," "machinations" and "infamy" represented statements of opinion regarding conduct in light of the character of the article, and could not, therefore, be made the basis for a libel action.

 However, the major paragraph of the article, describing plaintiff and others as part of a "combine" which extorted $100,000 from the developer by blackmail, was such that it could not be said to be clearly factual or clearly a matter of opinion; this part of the article was ambiguous, as it omitted mention that the $100,000 had actually been paid to the City of Seal Beach rather than to the councilmen personally, although the statements were made in the context of criticizing a transaction the details of which were widely and publicly known. Under these circumstances, the *Good Government* majority concluded that "it is for the jury to determine whether an ordinary reader would have understood the article as a factual assertion charging Hogard with crime, or whether the statements were generally understood as an opinion respecting his public conduct in regard to the development project." (*Good Government, supra,* 22 Cal.3d 672, 682.)

It was further held in *Good Government* that the second question—the question of malice—could be answered affirmatively, that a sufficient showing of malice had been made considering the test to be used. The test was set forth in the following observation: "[I]n order to find the requisite malice from the publication of ambiguous words which could constitute either fact or opinion, the jury must find not only that the words were reasonably understood in their defamatory, factual sense, but also that the defendant either deliberately cast his statements in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or that he knew or acted in reckless disregard of whether his words would be interpreted by the average reader as defamatory statements of fact." (*Good Government, supra,* 22 Cal.3d 672, 684.)

The evidence that plaintiff Hogard presented which the *Good Government* court held to amount to a sufficient showing of malice to constitute a jury question was a declaration by Hogard that, after a retraction by

defendants of the references to blackmail and extortion, he observed various of the defendants distributing a flyer of the article as originally printed. The court observed that "a jury could conclude from this evidence that at least some of the defendants were aware that the words used in the article could be interpreted as defamatory statements of fact instead of 'allegorical language . . . voicing a vigorous political opinion, in strident tones,' as defendants claim." (*Id.*, at p. 686.)

### III

#### *Is the Good Government Case Dispositive of the Case at Bench?*

The *Good Government* court's determination of "ambiguity" in the article upon which the litigation before us is also based is clearly dispositive herein with respect to the issue of whether the publication constituted a *factual assertion* that plaintiff Fuhrman had committed "extortion" or "blackmail." Since this presented a triable issue as to Hogard, the real party in interest in *Good Government,* it necessarily presents a triable issue as to plaintiff Fuhrman in the case before us.

■ But defendants here contend that the evidence presented by plaintiff Fuhrman on the issue of "malice" was not the same as that presented by Hogard in the latter's action, and, therefore, does not require the same result as that reached in the *Good Government* case. We note that, in the case at bench, plaintiff Fuhrman did not present a declaration by Hogard with regard to the distribution efforts of the defendants after retraction, the basis upon which the *Good Government* court decided that a sufficient showing of malice had been made. The plaintiff Hogard, the real party in interest in *Good Government,* was represented in the trial court by attorneys different from the attorneys who represented Fuhrman, the plaintiff before us, in the trial court.

But in the instant case, plaintiff filed, in opposition to defendants' motion for summary judgments, a declaration by Petrus Roelofs, a Seal Beach citizen, and political supporter of the plaintiff. In his declaration, Roelofs stated that, during the latter part of February 1971 and "during the month of March 1971," he personally saw various of the defendants, setting forth their names, deliver and leave with many people and citizens of Seal Beach the offensive article. A reasonable inference may be drawn from this declaration that the original article was being distributed by defendants in March 1971, *after* publication of the retraction in a

pre-March 10, 1971, newsletter. Such an inference supports the same conclusion reached in *Good Government* that at least some of the defendants were aware that the words used in the article could be interpreted as defamatory statements of fact instead of statements of "vigorous political opinion."

The defendants assert that Roelofs' declaration is not precise as to any time sequence between the date of retraction and the continued distribution of the original article. But this lack of precision is not fatal to the question of whether plaintiff had demonstrated the existence of a triable issue of malice because of the principles governing summary judgment proceedings. It is a fundamental principle that "[u]nder well established rules governing summary judgment motions, the affidavits of the moving party are to be *strictly* construed and those of the opponent *liberally* construed." (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].) (Italics added.) It has also been said that "[t]he purpose of the summary procedure is to penetrate through evasive language and adept pleading and ascertain the existence or absence of triable issues." (*Id.* at p. 873.)

It would indeed be unfortunate and anomalous if the instant case were required to be decided differently from the *Good Government* case because of the happenstance that the two separate plaintiffs were represented below by different counsel when the question of triable issues of fact rests on the very same facts arising out of the one publication of an allegedly defamatory article referring to both plaintiffs and one publication of a retraction. Two plaintiffs who stand in the exact same position with respect to whether they were defamed by defendants' one publication are entitled to equal treatment on this issue of defamation at the summary judgment stage.

The judgments are reversed.

Files, P. J., and Alarcon, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied June 27, 1979.