[S.F. No. 24686. Nov. 19, 1984.]

READER'S DIGEST ASSOCIATION, INC., et al., Petitioners, v. THE SUPERIOR COURT OF MARIN COUNTY, Respondent; SYNANON CHURCH et al., Real Parties in Interest.

248

Counsel

Pillsbury, Madison & Sutro, William I. Edlund, Walter R. Allan, John A. Sutro, Jr., Donald M. Egeland and David Otis Fuller, Jr., for Petitioners.

No appearance for Respondent.

Bourdette, Benjamin & Weill, Philip C. Bourdette and David R. Benjamin for Real Parties in Interest.

Opinion

**BROUSSARD, Acting C. J.**—Petitioners seek a writ of mandate to review a ruling of the Marin County Superior Court denying their motion for summary judgment.

Petitioners are codefendants in a suit for libel and related causes of action filed by the Synanon Church (Synanon) and Charles Dederich, its founder. Plaintiffs allege that they were defamed in an article written by David MacDonald, an employee of Reader's Digest, and published in the July 1981 edition of Reader's Digest. The article, entitled *The Little Paper That Dared,* describes how David and Cathy Mitchell, publishers of the Point Reyes Light, received the Pulitzer Prize for a series of reports and articles critical of Synanon. Although Synanon has filed other suits attacking the articles in the Point Reyes Light, the present action relates only to the Reader's Digest article.

David MacDonald based his article on the Mitchells' newspaper accounts, their subsequent book, The Light on Synanon, research papers on Synanon by Richard Ofshe, professor of sociology at the University of California, and conversations with Ofshe and the Mitchells. The Mitchells reviewed a draft of the article and suggested corrections, some of which Reader's Digest adopted.

The article recounts the history of Synanon from its inception in 1958 as a program for the rehabilitation of drug addicts. It notes the transformation of Synanon into an "alternative life-style community," claiming to be a church, and describes the Mitchells' accusation that local officials had been lax in enforcing the law against Synanon. The Reader's Digest article went on to charge that Synanon had adopted a policy of intimidation, and cited examples: an assault on a former member when he returned to visit the Synanon facility in west Marin County, and a similar attack on another

member who left Synanon when he refused Dederich's orders to have a vasectomy. In particular, the article discussed the case of Paul Morantz, an attorney who had filed several suits against Synanon and who was bitten by a rattlesnake placed in his mailbox. Dederich and two Synanon members were charged with conspiracy to murder Morantz, and were subsequently convicted and sentenced.

Despite the numerous and serious charges stated in the article, plaintiffs' lawsuit singles out only three sentences as defamatory. These sentences read: "Synanon was founded in 1958 by Charles Dederich, a reformed alcoholic, to rehabilitate drug addicts. Though his spectacular claims of success were never proved, Dederich and Synanon attracted publicity and enough cash donations to start a string of addiction centers. . . . Since 1968, minimal drug rehabilitation work had been attempted; funds, however, were still solicited on that basis." Plaintiffs assert that the sentences communicate to the reader "that plaintiffs have not been and are not successful in rehabilitating drug addicts and other character-disordered persons and that plaintiffs' representations of success were fraudulently made to enrich themselves."[1]

Synanon's suit names Reader's Digest, MacDonald, Ofshe, and the Mitchells as defendants. Reader's Digest and MacDonald moved for summary judgment. They claim that Synanon and Dederich are "public figures" under the New York Times doctrine (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R. 2d 1412]), and consequently that defendants can be liable only for a statement "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706].) The moving defendants maintain that there is no triable issue of fact as to actual malice, and hence that they are entitled to summary judgment. The trial court stated that the issue was close, but denied the motion. ■ ■■■■ Reader's Digest and MacDonald now seek review by writ of mandate.[2] We will conclude that the trial court erred in denying the motion for summary judgment and that the writ of mandate should therefore issue.

---

[1] We do not understand the reference to "character-disordered persons" in the complaint and in plaintiffs' arguments. The questioned sentences, as we read them, refer only to the rehabilitation of drug addicts and to the solicitation of funds for that purpose.

[2] "A writ of mandate is a proper remedy to compel a trial court to grant a motion for summary judgment where the affidavits in support of the moving party are sufficient to sustain a judgment in his favor, and his opponent does not by counteraffidavit show facts sufficient to present a triable issue of fact." (*Roman Catholic Archbishop* v. *Superior Court* (1971) 15 Cal.App.3d 405, 410 [93 Cal.Rptr. 338]; *Iversen* v. *Superior Court* (1976) 57 Cal.App.3d 168, 170-171 [127 Cal.Rptr. 49]; see *Whitney's at the Beach* v. *Superior Court* (1970) 3 Cal.App.3d 258, 265-266 [83 Cal.Rptr. 237].)

I. *Summary Judgment as a Favored Remedy in Defamation Actions.*

Before addressing the merits of the ruling below, we first examine whether summary judgment is a favored or disfavored remedy in defamation cases. In 1978, this court in *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672 [150 Cal.Rptr. 258, 586 P.2d 572], said that "because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citing *Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486-487 [14 L.Ed. 22, 28-29, 85 S.Ct. 1116].] Therefore, summary judgment is a favored remedy, and upon such a motion the trial court must determine whether there is a sufficient showing of malice to warrant submission of that issue to the jury." (P. 685.) Court of Appeal decisions echo this approving view of summary judgment, though cautioning that summary disposition is not appropriate if a triable issue of fact exists. (See *Kaufman* v. *Fidelity Fed. S. & L. Assn.* (1983) 140 Cal.App.3d 913, 920 [189 Cal.Rptr. 818]; *Bill* v. *Superior Court* (1982) 137 Cal.App.3d 1002, 1015 [187 Cal.Rptr. 625]; *Desert Sun Publishing Co.* v. *Superior Court* (1979) 97 Cal.App.3d 49, 53 [158 Cal.Rptr. 519]; *Fuhrman* v. *Risner* (1979) 92 Cal.App.3d 725, 730-731 [155 Cal.Rptr. 122].)

The United States Supreme Court, and in particular Chief Justice Burger, however, has implied that summary judgment may be unsuited for deciding issues of actual malice. In *Hutchison* v. *Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675], the district court had granted summary judgment for defendant, noting that in deciding issues of actual malice "summary judgment might well be the rule rather than the exception." (P. 120 [61 L.Ed.2d at p. 422].) While reversing the district court on other grounds (the high court held that plaintiff was not a public figure and thus the *New York Times* standard did not apply), the opinion commented in a footnote: "Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called 'rule'. The proof of 'actual malice' calls a defendant's state of mind into question, *New York Times Co.* v. *Sullivan,* 376 U.S. 254 (1964), and does not readily lend itself to summary disposition. [Citations.] In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us." (443 U.S. at p. 120, fn. 9 [61 L.Ed.2d at p. 422].)[3]

---

[3]The court referred to this footnote in *Wolston* v. *Reader's Digest Assn., Inc.* (1979) 443 U.S. 157, 161, footnote 3 [61 L.Ed.2d 450, 416, 99 S.Ct. 2701], but again declined to decide the role of summary judgment in defamation litigation. In *Bose Corp.* v. *Consumers Union* (1984) 466 U.S. 485 [80 L.Ed.2d 502, 104 S.Ct. 1949], the district court had granted summary judgment for plaintiff; the court of appeals reversed and the Supreme Court affirmed the court of appeals. Its decision holds that an appellate court has a duty to make an independent examination of the record in First Amendment cases, but did not discuss whether such cases should be decided by summary judgment.

It is pointless to declare in the abstract that summary judgment is a favored or disfavored remedy. A more subtle analysis is required—one that explains how a motion for summary judgment should be decided in a defamation case under the *New York Times* test. ■ The Fifth Circuit in *Rebozo* v. *Washington Post Co.* (1981) 637 F.2d 375, undertook such an analysis and reached the following conclusion: "[T]he standard of review of First Amendment defamation actions, as in all summary judgment cases, is whether the record, construed in a light most favorable to the party against whom the judgment has been entered, demonstrates there are genuine issues of fact which, if proven, would support a jury verdict for that party. Since, however, a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other cases, *Brewer* v. *Memphis Publishing Co.*, 626 F.2d 1238, 1258 (5th Cir. 1980), the evidence and all the inferences which can reasonably be drawn from it must meet the higher standard." (P. 381.)

We recognize a potential chilling effect from protracted litigation as well as a public interest in resolving defamation cases promptly. That does not mean, however, that a court should grant summary judgment when there is a triable issue of fact as to actual malice. Instead, courts may give effect to these concerns regarding a potential chilling effect by finding no triable issues unless it appears that actual malice may be proved at trial by clear and convincing evidence—i.e., evidence sufficient to permit a trier of fact to find for the plaintiff and for an appellate court to determine that the resulting judgment " 'does not constitute a forbidden intrusion on the field of free expression' " (*Bose Corp.* v. *Consumers Union, supra,* 466 U.S. 485 at p. — [80 L.Ed.2d 502 at p. 515]). To this extent, therefore, summary judgment remains a "favored" remedy in defamation cases involving the issue of "actual malice" under the *New York Times* standard.

II. *Synanon and Charles Dederich Are "Public Figures."*

Synanon and its founder, Dederich, first contest their status as "public figures," a question of law which is crucial to the proper resolution of their libel claim.[4] In *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], the United States Supreme Court fundamentally altered judicial treatment of defamation actions by placing a significant constitutional limitation on the ability of a public official to recover damages for a defamatory falsehood. Emphasizing the importance of free expression and a free press under the First Amendment,

---

[4]The trial court found as a matter of law that Synanon and Dederich were "public figures" under the relevant standards.

the Supreme Court determined that "public officials" may not prevail in an action for libel relating to their official conduct absent proof that the statement was made with "actual malice." (See also *St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].) Three years later, the court held that "public figures"—like public officials—must also prove actual malice in order to recover in a defamation action. (*Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975].) Though holding that the plaintiffs in the two cases before it properly fell under the aegis of "public figures," the court did not offer an encompassing definition of that term.[5] Further refinement of the concept was developed in subsequent United States Supreme Court decisions.

In *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], the court provided a twofold rationale for extending the *New York Times* rule to "public figures." First, it recognized that public figures are generally less vulnerable to injury from defamation because of their ability to resort to effective "self help." Such persons ordinarily enjoy considerably greater access than private individuals to the media and other channels of communication. This access in turn enables them to counter criticism and to expose the fallacies of defamatory statements. (418 U.S. at p. 344 [41 L.Ed.2d at p. 808].) Second, and more significantly, the court cited a normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." (418 U.S. at p. 345 [41 L.Ed.2d at p. 808]; see also *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at p. 164 [18 L.Ed.2d at p. 1116] (Warren, C. J., conc. in result).)

Having thus explained the rationale for the public figure classification, the *Gertz* decision defined two classes of public figures. The first is the "all purpose" public figure who has "achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." The second category is that of the "limited purpose" or "vortex" public figure, an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." (418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) Unlike the "all purpose" public figure, the "limited purpose" public figure

---

[5]In *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130 the plaintiff was an athletic director of a major university who challenged a magazine report that he had conspired with a counterpart at another university to fix the outcome of a football contest. Plaintiff in the companion case of *Associated Press* v. *Walker* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975] was a retired Army officer who had "thrust himself into the vortex of the controversy" over admission of blacks to a state university. As noted above, both were held to be "public figures" for purposes of their defamation suits.

loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy. ■
In the present case, we find that Synanon should at the very least be classified as a "limited purpose" public figure for the purposes of this general controversy, and that Dederich is a public figure to the extent that his conduct in directing the activities of Synanon is at issue.

■ The cases decided since *New York Times* and *Gertz* make it clear that a person or group should not be considered a "public figure" solely because that person or group is a criminal defendant (*Wolston* v. *Reader's Digest Assn., Inc., supra,* 443 U.S. 157); has sought certain relief through the courts (*Time, Inc.* v. *Firestone* (1976) 424 U.S. 448 [47 L.Ed.2d 154, 96 S.Ct. 958]); or merely happens to be involved in a controversy that is newsworthy (*Time, Inc.* v. *Firestone, supra*). Rather, as this court recognized in *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14], a "public figure" plaintiff must have undertaken some *voluntary* act through which he seeks to influence the resolution of the public issues involved.[6] As such, the mere involvement of a person in a matter which the media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action.

In sum, when called upon to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported

---

[6]In *Wolston* v. *Reader's Digest Assn., Inc., supra,* 443 U.S. 157, for example, the Supreme Court addressed more specifically the factors which control whether or not a particular plaintiff is a "public figure." Wolston, who had been undergoing interrogation with respect to the activities of Soviet intelligence agents in the United States, failed to respond to a grand jury subpoena. He subsequently pleaded guilty to contempt charges and received a suspended sentence. These proceedings were attended by considerable newspaper publicity, but Wolston then returned to relative obscurity until, some 16 years later, a publisher named him as one of several "Soviet agents identified in the United States." He sued for libel; the publisher asserted the qualified constitutional privilege on the ground that Wolston had become a "public figure." Lower courts agreed with the publisher; the Supreme Court reversed. Particularizing its comments to the facts before it, the Supreme Court said: "[T]he mere fact that petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public-figure status. . . . [A] court must focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' . . . [P]etitioner never discussed this matter with the press and limited his involvement to that necessary to defend himself of the contempt charge. . . . [¶] [T]he simple fact that these events attracted media attention also is not conclusive of the public-figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. . . ." (443 U.S. at p. 167.)

For a detailed discussion of the factors to be considered in determining whether an individual is a public figure for the purposes of a certain issue, see Note, *Constitutional Protection of Critical Speech and the Public Figure Doctrine: Retreat by Reaffirmation* (1980) Wis. L.Rev. 568.

"public figures" have thrust themselves into the forefront of particular public controversies. As is reflected in the evolution of the public figure doctrine, from *Butts* through *Gertz, Firestone* and *Wolston*, such a determination is often a close question which can only be resolved by considering the totality of the circumstances which comprise each individual controversy.

 In the instant matter, it is clear that both Synanon and Dederich should indeed by accorded public figure status for the proper resolution of their defamation action. This determination is not based on the organization's and Dederich's own statements regarding their public visibility and reputation,[7] but instead is grounded in their myriad attempts to thrust their case and Synanon in general into the public eye.

Plaintiffs have been the subject of a full-length movie (a 1966 production entitled "Synanon" and starring Chuck Connors as the Charles Dederich character), four books, favorable magazine articles in Life, Time and even Reader's Digest (two 1970 articles) and numerous newspaper articles. For many years Synanon engaged in extensive publicity campaigns in which it sought and achieved a favorable reputation as an organization for the rehabilitation of drug addicts.

When Synanon's reputation began to sour somewhat in the late 1970's, largely as a result of the articles in the Point Reyes Light, Synanon's response went far beyond defensive litigation. In 1979, shortly after the Point Reyes Light received the Pulitzer Prize, the United Press International (UPI) filed a formal complaint against Synanon with the National News Council. UPI charged therein that the foundation had engaged in systematic efforts "to threaten UPI's reputation and, generally, object to any news coverage which reflects unfavorably upon Synanon." UPI further charged that Synanon's lawyers have been "flooding the nation's news media with letters threatening libel suits as a part of the systematic pattern of intimidation designed to suppress all stories they considered unfavorable." Even reports on the award of the Pulitzer Prize to the Point Reyes Light drew form letters demanding retraction on pain of suit.

---

[7] The record contains numerous examples of Synanon and Dederich's own evaluation of their fame. For example, by their own declarations in documents filed in court proceedings, Synanon claims to be "internationally renowned," a "renowned expert," "world-famous," "widely recognized," and "widely known to the community generally." Both Synanon and Dederich claim to have an "international reputation." Dederich summed it up: "We had had enormous amounts of publicity. Now, we really are world famous. I have been more famous than Santa Claus and more people knew about me than knew about World War II. We have been written about, photographed and movied and televised and so on pretty— pretty steadily through the years. I don't think we are as famous as Muhammed Ali. Of course, nobody is. But we are pretty famous."

In investigating UPI's charges, the National News Council staff discovered that the foundation had initiated the "Retraction Project." According to Synanon's own reports, this project sent out at least 960 letters to the media during 1978 and 1979, arguing its case and intentionally attracting further attention to its cause. Recipients included all the major television networks and many of their affiliates as well as hundreds of newspapers ranging from the Wall Street Journal and the New York Times to the Billings Gazette (Mont.). Synanon also contracted with a nationwide service to provide clips of articles published relating to its activities, and according to its report, 11,136 such clips were provided during 1978 and 1979 alone.

While any person or organization has the right to engage in publicity efforts and to attempt to influence public and media opinion regarding their cause, such significant, voluntary efforts to inject oneself into the public arena require that such a person or organization be classified as a public figure in any related defamation actions. In the instant case, Synanon and its founder have sponsored massive publicity and self-promotion efforts over a period of many years and apparently *increased* these efforts with regard to the present controversy. As such, they enjoyed remarkable access to the media through which to counter any criticisms they deemed to be unwarranted and voluntarily exposed themselves to increased risk of injury from unfavorable commentary about them. Thus they have clearly met the standards for "public figure" status for purposes of this defamation action.

III. *The Record Presents No Triable Issue of Actual Malice.*

As we noted earlier, the *New York Times* decision superimposed a constitutional standard on the common law of libel. ■ If the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence (see *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 285-286 [11 L.Ed.2d 686, 706-707]), that the libelous statement was made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (Pp. 279-280 [11 L.Ed.2d at p. 706].) That decision did not define the phrase "reckless disregard," and its use of the term—"actual malice"—which had a different meaning in the common law of libel, engendered some confusion.

Four years later, in *St. Amant* v. *Thompson, supra,* 390 U.S. 727, the high court sought to clarify the constitutional standard. First, it explained, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing

with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (P. 731 [20 L.Ed.2d at p. 267].)[8]

The quoted language establishes a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue. (See *Alioto* v. *Cowles Communications, Inc.* (N.D. Cal. 1977) 430 F.Supp. 1363, 1365-1366.) This test directs attention to the "defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff." (*Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 434 [142 Cal.Rptr. 304].)

■ Although the ultimate issue is thus the good faith of the publisher, the court explained that a defendant cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (*St. Amant* v. *Thompson, supra,* 390 U.S. 727, 732 [20 L.Ed.2d 262, 267-268], fn. omitted.)

■ As *St. Amant*'s examples suggest, actual malice can be proved by circumstantial evidence. "[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity." (*Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324, 342; *Widener* v. *Pacific Gas & Electric Co., supra,* 75 Cal.App.3d 415,

---

[8]The court further observed that "[i]t may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases would have drawn between false communications which are protected and those which are not." (390 U.S. at p. 731-732 [20 L.Ed.2d at p. 267].)

434.) A failure to investigate[9] (see *Widener* v. *Pacific Gas & Electric Co.*, *supra*, 75 Cal.App.3d 415, 435), anger and hostility toward the plaintiff (*id.*, at p. 436), reliance upon sources known to be unreliable (*Curtis Publishing Co.* v. *Butts, supra*, 388 U.S. 130, 156 [18 L.Ed.2d 1094, 1111]; *Pep* v. *Newsweek, Inc.* (S.D.N.Y. 1983) 553 F.Supp. 1000, 1002), or known to be biased against the plaintiff (*Fisher* v. *Larsen* (1982) 138 Cal.App.3d 627, 640 [188 Cal.Rptr. 216]; *Burns* v. *McGraw-Hill Broadcasting Co., Inc.* (Colo. 1983) 659 P.2d 1351, 1361-1362)—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.

We emphasize that such evidence is relevant only to the extent that it reflects on the subjective attitude of the publisher. (*St. Amant* v. *Thompson, supra*, 390 U.S. 727, 732-733 [20 L.Ed.2d 262, 268]; *Pep* v. *Newsweek, Inc., supra*, 553 F.Supp. 1000, 1003; *Velle Transcendental Research Ass'n* v. *Sanders* (C.D.Cal. 1981) 518 F.Supp. 512, 518-519.) The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy. (See *St. Amant* v. *Thompson, supra*, 390 U.S. 727, 733 [20 L.Ed.2d 262, 268]; *Beckley Newspapers* v. *Hanks* (1967) 389 U.S. 81, 84-85 [19 L.Ed.2d 248, 252, 88 S.Ct. 197].) Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient. (*Gomes* v. *Fried* (1982) 136 Cal.App.3d 924, 934-935 [186 Cal.Rptr. 605].)

■ Upon examining the record before us, we find no triable issue as to actual malice. There is no direct evidence that MacDonald or other Reader's Digest personnel believed the questioned passages in the article were false, or even entertained serious doubts respecting their truth. Reader's Digest relied primarily upon the writings and conversations with Professor Ofshe and the Mitchells. Dr. Ofshe is a professor of sociology at a leading university and the author of a number of studies on Synanon; the Mitchells received the Pulitzer Prize for their reports and editorials on Synanon. Plaintiffs questioned the objectivity of these sources, and the extent of their

---

[9]Plaintiff argues that the Reader's Digest had a higher duty to investigate because the article was not "hot news," citing *Curtis Publishing Co.* v. *Butts, supra*, 388 U.S. 130, 156 [18 L.Ed.2d 1094, 1111] (opn. of Harlan, J.). The plurality opinion in *Curtis* proposed an objective standard—"highly unreasonable conduct" (p. 158 [18 L.Ed.2d at p. 1113])—to govern liability in suits by public figures who were not public officials. That standard has since been superseded for both public figures and public officials by the subjective standard set out in *St. Amant* v. *Thompson, supra*, 390 U.S. 727. As a result, the distinction between "hot news" and other news drawn by *Butts* has lost much of its force (see discussion in *Barger* v. *Playboy Enterprises, Inc.* (N.D.Cal. 1983) 564 F.Supp. 1151, 1156); it remains relevant only in that a failure to investigate cannot be significant if there was no time to investigate.

knowledge of Synanon, but do not question that Reader's Digest considered them to be persons of unsullied reputation.[10]

In this setting, Reader's Digest's failure to contact Synanon or to conduct an objective investigation is relatively inconsequential. A publisher does not have to investigate personally, but may rely on the investigation and conclusions of reputable sources. "Where the publication comes from a known reliable source and there is nothing in the circumstances to suggest inaccuracy, there is no duty to investigate." (*Bindrim* v. *Mitchell* (1979) 92 Cal.App.3d 61, 73 [155 Cal.Rptr. 29]; see *Brewer* v. *Memphis Pub. Co., Inc.* (5th Cir. 1980) 626 F.2d 1238; *Vandenburg* v. *Newsweek, Inc.* (5th Cir. 1975) 507 F.2d 1024, 1028; *Barger* v. *Playboy Enterprises, Inc., supra,* 564 F.Supp. 1151, 1157; *Trans World Accounts, Inc.* v. *Associated Press* (N.D.Cal. 1977) 425 F.Supp. 814, 822; *Martin Marietta Corp.* v. *Evening Star Newspaper* (D.D.C. 1976) 417 F.Supp. 947, 958-959; cf. *Velle Transcendental Research Ass'n* v. *Sanders, supra,* 518 F.Supp. 512, 518-519 [reliance on sources of doubtful reputation but corroborated each other].)[11]

Neither is there a duty to write an objective account. A publisher is "not required to provide an objective picture (*New York Times Company* v. *Connor* (5th Cir. 1966) 365 F.2d 567, 576) or an accurate one [citing *Time, Inc.* v. *Pape* (1971) 401 U.S. 279 (28 L.Ed.2d 45, 91 S.Ct. 633)]" (*Gomes* v. *Fried, supra,* 136 Cal.App.3d 924, 934). So long as he has no serious doubts concerning its truth, he can present but one side of the story. (*Vandenburg* v. *Newsweek, Inc., supra,* 507 F.2d 1024, 1028.) The Reader's Digest could properly tell the story of how the Mitchells won the Pulitzer Prize, and in that story reflect the Mitchells' views on Synanon, without also presenting Synanon's side of the picture. Fair and objective reporting may be a worthy ideal, but there is also room, within the protection of the First Amendment, for writing which seeks to expose wrongdoing and arouse righteous anger; clearly such writing is typically less than objective in its presentation.

[10]Compare *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130 (reliance without corroboration upon man on criminal probation who claimed to have overheard a telephone call); *Pep* v. *Newsweek, Inc., supra,* 553 F.Supp. 1000 (reliance upon source reputed to be a compulsive gambler, a swindler and a liar).

[11]The superior court, in finding a triable issue of fact as to Reader's Digest's alleged reckless disregard of the truth, quoted *Goldwater* v. *Ginzburg, supra,* 414 F.2d 324, 343, where the court stated that "[r]ecklessness is, after all, only negligence raised to a higher power." (Accord, *Fisher* v. *Larsen, supra,* 138 Cal.App.3d 627, 640.) That language in the context of the *New York Times* standard is somewhat misleading. "Reckless disregard of the truth," as defined in *St. Amant* v. *Thompson, supra,* 390 U.S. 727, does not mean gross or even extreme negligence, but requires actual doubt concerning the truth of the publication.

 Synanon argues that Reader's Digest's knowledge that Synanon had already sued Dr. Ofshe and the Mitchells for libel should have led Reader's Digest to require independent corroboration of the statements from these sources. It also maintains that when Reader's Digest received a demand for retraction before it published certain foreign language editions of the article, it was then on notice of the need for further investigation. (See *Bindrim* v. *Mitchell, supra,* 92 Cal.App.3d 61, 74.)

Both arguments assume that the threat or filing of a libel action should cause a publisher to have serious doubts about the truth of its story and the truthfulness of its sources. But Reader's Digest was aware that, as reported in MacDonald's article, "Synanon's 40-member legal department often used the courts to silence articles and block efforts at governmental control." A National News Council report described Synanon as using litigation "for coercing the press into silence about Synanon and its affairs," and the Pulitzer Prize Committee, in awarding the prize to the Mitchells, praised their refusal to yield to threats of lawsuits. The threat of a libel suit by Synanon might well give a publisher pause, but it would not necessarily lead it to doubt the truthfulness of its article or its sources.

Plaintiffs point to a letter written by MacDonald a year before the article was published, in which he wrote: "For what started as a do-good organization, I must say Synanon seems very, very nasty indeed, and litigious as hell." They suggest that this letter proves that MacDonald was biased against them. At the time he wrote the letter, however, MacDonald was well into the preparation of his article; he was aware of Synanon's hoarding of arms, the assaults upon former members, the burning of the house of a former member, the rattlesnake attack on Attorney Morantz, and of Synanon's numerous lawsuits. His letter seems a reasonable reaction to what he had learned in preparing to write the article, and does not indicate a state of mind that would suggest that he had serious doubts about the article's veracity.

Plaintiffs also point out that one of the Reader's Digest editors deleted the phrase "one time heroin user" from a description of Jack Hurst, a Synanon director, and made the marginal notation "credibility—of rehabilitation program!" Plaintiffs infer from this cryptic comment that the editor was unwilling for the article to acknowledge that even one former drug user had been rehabilitated by Synanon. But under the *St. Amant* standard, the nonobjectivity of the editor is not the issue. To show actual malice, plaintiffs would have to draw the inference that the editor's knowledge of Hurst's rehabilitation led him to doubt the truth of the article's statements that after 1968 Synanon's rehabilitation program was minimal. This is a dubious inference at best; moreover, with the Hurst deletion as the strongest evidence

we have found in the record to support plaintiffs' position, we conclude that a trier of fact could not find clear and convincing evidence of actual malice.[12]

Plaintiffs further rely, however, on the argument that the Reader's Digest article factually departs from the statements and information furnished by Ofshe and the Mitchells. Such a contention squarely raises the question of the extent to which the *New York Times* standard of actual malice permits the exercise of "literary license."

The language of *New York Times* itself clearly implies that all publications must necessarily be permitted some degree of flexibility in their choice of the proper words and phrases to describe the subject at issue: "[E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" (*New York Times, supra,* 376 U.S. at pp. 271-272 [11 L.Ed. at p. 701], citation omitted.) Further, the United States Supreme Court has reaffirmed this concept in several more recent decisions. "Realistically, . . . some error is inevitable; and the difficulties of separating fact from fiction convinced the court in *New York Times, Butts, Gertz,* and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material." (*Herbert* v. *Lando* (1979) 441 U.S. 153, 171-172 [60 L.Ed.2d 115, 131, 99 S.Ct. 1635].)

In its very recent decision on this same issue, the United States Supreme Court clearly recognized the need for a certain degree of literary license when properly applying the *New York Times* standard to the facts of each case. In *Bose Corp.* v. *Consumer's Union, supra,* 466 U.S. 485 [80 L.Ed.2d 502], the alleged defamatory material consisted of a statement in Consumer Reports magazine that the musical sound projected by Bose's speakers tend-

---

[12]Plaintiffs raise two other matters. First, they assert that the Reader's Digest Editorial Research Manual admonishes researchers to "begin with available *Digest* Sources," but that MacDonald ignored two Reader's Digest articles published in 1970 which praised Synanon's rehabilitation program. Both articles were primarily concerned with the Synanon program of the 1960's, and do not substantially contradict MacDonald's thesis that Synanon has changed since 1968, and that drug rehabilitation is now minimal.

Plaintiffs also suggest that MacDonald's notes of a conversation with Dr. Ofshe show that he was aware of Synanon's continued drug rehabilitation program. The notes read: "Undeserved rep. as miracle drug cure . . . 1,000 a year coming in. Far more successful in business than in rehab." Those notes show only that MacDonald was aware of about 1,000 persons entering the program a year, but that Dr. Ofshe did not consider the program very successful. The article did not say that Synanon had no drug rehabilitation program, but only that its program was "minimal." An unsuccessful program which attempts to treat 1,000 persons a year, carried on by an organization which invests the greater part of its energy in other matters, could be characterized as a "minimal" program.

ed to wander "about the room." Plaintiff corporation argued that the sound in fact tended to wander "along the wall" and introduced the testimony of the engineer who performed the evaluation for defendant magazine in order to corroborate this latter interpretation. The United States Supreme Court rejected plaintiff's argument that such a choice of words constituted defamation and approved the author's choice of words as a valid exercise of literary license. They characterized the magazine's adoption of the particular phrase "about the room" as " 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer. [Citation.] The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella . . . . The statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies. [Citing *Time, Inc.* v. *Pape* (1970) 401 U.S. 279, 290-292 (28 L.Ed.2d 45, 53-54, 91 S.Ct. 633).]" (*Bose Corp.* v. *Consumer's Union, supra,* 466 U.S. 485, — [80 L.Ed.2d 502, 525].)[13]

The allegedly defamatory statements in the instant case provide similarly apposite examples of the importance of literary license to a competent and free press. The two sentences which Synanon has claimed to be particularly defamatory focus on the phrase that the foundation's "spectacular claims of success were never proved," and the statement that "[s]ince 1968, minimal drug rehabilitation work had been attempted; funds, however, were still solicited on that basis." Synanon contends that neither of these two statements finds any support in Reader's Digest's research and specifically in the interviews with the Mitchells and Professor Ofshe. However, if we permit Reader's Digest a reasonable degree of flexibility in its choice of language, Synanon's claims fail on both counts.

---

[13]Although California courts have never directly addressed this concept of literary license, there is an appropriate analogy in the "fair report" privilege. Civil Code section 47, subdivision 4, provides that a privileged publication is one made by a "fair and true report" of various official proceedings. Several cases have been decided under this statute, and all permit a certain degree of flexibility/literary license in defining "fair report." " 'It is well settled that a defendant is not required in an action of libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified. . . .' " (*Hayward* v. *Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255, 262 [71 Cal.Rptr. 295], citing *Kurata* v. *Los Angeles News Pub. Co.* (1935) 4 Cal.App.2d 224 [40 P.2d 520].)

Similarly, the court in *Handelsman* v. *San Francisco Chronicle* (1970) 11 Cal.App.3d 381 [90 Cal.Rptr. 188] pursued the definition of "fair and true." There, defendant newspaper published an account of a civil lawsuit filed against the plaintiff which was "translated" by the writer, who characterized the allegation of civil conversion as "outright theft." The court also cited *Kurata, supra,* 4 Cal.App.2d at pages 227-228: " ' "If the substantial imputations be proved true, a slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently than the actual truth would." ' " (*Handelsman, supra,* 11 Cal.App.3d at p. 387.)

Regarding the statement that Synanon's "spectacular claims of success were never proved," the record reveals that documentary sources available to the defendants reported that numerous claims of high success rates had been made by or attributed to Synanon and Dederich. These included a claimed cure rate for addicts of up to 90 percent. There was no evidence that Synanon or Dederich had ever disclaimed these reports. Indeed, Synanon's own publications boasted that the foundation was "the world's foremost authority on curing drug addiction," and that its "cure rate is 100%." Synanon's own publicity release stated that it had "helped some 40,000 drug addicts, alcoholics and juvenile delinquents" and is "the grandfather of over 3,000 American self-help programs." Dederich himself asserted that he "personally helped hundreds, and possibly thousands, of people," and that Synanon's rehabilitation rate was and is "totally miraculous."

The record also reveals that plaintiffs themselves have on occasion acknowledged that there is no basis for such claims of success. Indeed, Dederich personally stated, "Our statistics are utterly ridiculous. One in thirty stayed . . . . We don't call ourselves any kind of rehab place . . . . We're just lying." Equally as important, despite Synanon's assertions to the contrary, it is clear that both the Mitchells and Dr. Ofshe believed that many of Synanon's claims were, at the very least, exaggerated. Plaintiffs draw attention to the fact that David Mitchell was unwilling in deposition to use the precise term "spectacular" when describing Synanon's claims of success, but there is much evidence in the record which indicates the Mitchells' grave doubts about many of Synanon's broad claims. In a similar vein, although Synanon contends that Dr. Ofshe never made that exact statement either, their own "expert" analysis of Dr. Ofshe's statements are in accord with defendants' interpretation. For example, they stated "the thrust of [Ofshe's] paper is that Synanon never achieved the degree of successful drug rehabilitation that it claimed or that outsiders believed . . . Ofshe . . . sees the whole history of Synanon as a failure to cure addicts."

It is readily apparent that *both* Synanon and Reader's Digest correctly interpreted Dr. Ofshe's study and its conclusion about Synanon's claims of success. In fact, the study at one point concluded, "No rigorous research has ever shown Synanon's approach worked any better than dozens of other drug programs . . . . What set Synanon apart from all other programs was not success but public relations." When this study and many of Synanon's and Dederich's own statements are examined, it becomes clear that Reader's Digest's statement regarding "spectacular" claims of success which were unproven draws support from a fairly wide sampling of evidence. When this evidence is considered in the important context of an author's right to choose appropriate words and phrases, Synanon's quibbling over the use of

the word "spectacular" in no way constitutes a legitimate showing of defamation. A fair reading of all the material which was available to Reader's Digest and author MacDonald at the time the article was written clearly suggests that the description of Synanon's success claims as "spectacular" and "never proved" falls within an acceptable range of literary license.

In like manner, Reader's Digest's statement that since 1968 minimal drug rehabilitation work had been attempted, though funds were still solicited on that basis, also seems well within the range of appropriate literary license. Synanon emphasizes that none of MacDonald's sources offer any figures as to the extent of Synanon's rehabilitative program during the 1970's. They argue, in effect, that a program which has been deemphasized and assigned secondary status might still be more than "minimal." However, strong evidence indicates that this characterization was not only adequately supported by Reader's Digest's sources but also an accurate appraisal of reality.

Once again, Synanon and Dederich's *own* statements about the changing nature of the organization lend significant support to the author's assertion.[14] In addition to this source of confirmation, David Mitchell, who had investigated the Synanon operation for several years, confirmed in his deposition testimony that he advised the defendants that the article accurately reported Synanon's activities and conduct. This was in accord with information which Mitchell had received from his own sources that "very little of [Synanon's] activities were involved in curing addicts. It was still going on, but it was a small part of the overall activities of Synanon." Moreover, on reviewing the draft of the Reader's Digest article, David Mitchell himself suggested that the word "minimal" be employed, indicating that it was preferable to "very little."

Dr. Ofshe also had stated in several of his writings that the drug rehabilitation activities had been greatly deemphasized after 1968, leaving what was only a "small scale" program. This conclusion is supported by a va-

---

[14]For just one example, Reader's Digest obtained through discovery a tape recording of a 1977 speech by Dederich to Synanon members in which he says: "We are not . . . a rehabilitation place for dope fiends. We're, we're not. We stopped being that a long, long time ago. Very, very little of our energy goes into that situation. Almost none . . . . That notion is ten to twelve years old, that we are somehow a rehab place for dope fiends. We don't rehab dope fiends. They don't stay. We've been out of that business for a long time."

Reader's Digest does not claim that MacDonald relied on this tape recording in writing his article. The recording nevertheless lends support to our conclusion that MacDonald's characterization of Synanon's program during the 1970's as "minimal" is not an act of reckless disregard of the truth and in fact is quite an appropriate characterization.

riety of other evidence in the record, and Synanon again appears to be merely quibbling with the author's choice of words. Given the importance of permitting a reasonable degree of literary license, the statement in question seems easily supportable and by no means an act in reckless disregard of the truth.[15]

## IV. *Plaintiffs' Other Causes of Action.*

Although the parties concentrated their argument on the asserted cause of action for libel, plaintiffs' second amended complaint set forth several additional causes of action. These included claims for intentional infliction of emotional distress, invasion of privacy by placing plaintiffs in a "false light," and invasion of privacy by intrusion in plaintiffs' private affairs. Each of these additional causes of action are based upon the same facts as the cause of action for libel. Our conclusion that plaintiffs have failed to show a triable issue of fact as to actual malice requires summary judgment on every claim based upon the publication of the Reader's Digest article.

The *New York Times* decision defined a zone of constitutional protection within which one could publish concerning a public figure without fear of liability. That constitutional protection does not depend on the label given the stated cause of action (see *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 269 [11 L.Ed.2d 686, 700]); it bars not only actions for defamation, but also claims for invasion of privacy (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 387-388 [17 L.Ed.2d 456, 467, 87 S.Ct. 534]; *Goldman* v. *Time, Inc.* (N.D.Cal. 1971) 336 F.Supp. 133, 137-138; *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35 fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]). Dederich's cause of action for intentional infliction of emotional distress presents an issue of first impression, but fails for the same reason as his causes of action for defamation and privacy: liability cannot be imposed on any theory for what has been determined to be a constitutionally protected publication.

---

[15]Plaintiffs suggest that summary judgment should be denied to permit them to conduct further discovery. Plaintiffs have already deposed Dr. Ofshe, David Mitchell, David MacDonald and Heather Chapman (the Reader's Digest research editor). They have served and received responses to four sets of interrogatories and four sets of requests for documents. Their request for additional discovery suggests no specific persons or documents to be examined, but merely notes that "many editors and other individuals involved with the subject article have not yet been deposed." The possibility that plaintiffs will uncover clear and convincing evidence of actual malice by deposing various unnamed persons peripherally involved in the Reader's Digest editorial process is remote, and does not justify this court's abstaining from a decision on the merits of the summary judgment motion.

V. *Conclusion.*

The Reader's Digest article described Synanon as an organization which, under Dederich's leadership, had eventually adopted and carried out a policy of violence and intimidation. It is replete with statements referring to serious crimes, including attempted murder. The present lawsuit, however, ignores most of those charges, and instead quibbles about the wording of what would appear to be three of the more innocuous sentences in the article.[16]

One sentence asserted that Dederich's "spectacular claims of success were never proved . . . ." Synanon's own statements, as well as Reader's Digest's sources, indicate that plaintiffs claimed an extraordinary rate of success at rehabilitating drug addicts; plaintiffs merely deny that the claims themselves were "spectacular." Reader's Digest said that since 1968 "minimal drug rehabilitation work had been attempted"; plaintiffs admit that since 1968 Synanon's drug rehabilitation program has been deemphasized, and that it is now secondary to the main purposes of the organization, but argue only that even a deemphasized program may possibly be more than "minimal." Reader's Digest said Synanon still solicits funds for its drug rehabilitation program; plaintiffs respond only that Synanon also solicits funds for other purposes.

None of the alleged defamatory statements goes beyond what a responsible staff writer might draft on the basis of the information provided him by his sources. The sources themselves were persons of good, indeed distinguished, reputation. There is nothing at all in the record to suggest that MacDonald or anyone else at the Reader's Digest had any serious doubt as to the reliability of the sources or the truth of the challenged statements.

Since we conclude that the record reveals no clear and convincing evidence of "actual malice," as that term is defined in the controlling decisions of the United States Supreme Court, and thus fails to raise a triable issue of fact, summary judgment should therefore have been entered in favor of codefendants David MacDonald and the Reader's Digest. Let a peremptory writ of mandate issue directing the trial court to vacate its order denying petitioners' motion for summary judgment and to enter its order granting the motion.

---

[16]Compare *Cervantes* v. *Time, Inc., supra,* 464 F.2d 986, in which plaintiff, the Mayor of St. Louis, challenged only four paragraphs of an eighty-seven paragraph article charging that plaintiff had business relationships with criminal organizations in the city. The decision affirmed a summary judgment for the defendant.

Mosk, J., Kaus, J., Reynoso, J., Grodin, J., Lucas, J., and Rouse, J.,* concurred.

---

*Assigned by the Acting Chairperson of the Judicial Council.