Filed 3/11/14  McGraw v. Superior Court CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| PHILLIP C. MCGRAW et al., | No. B249048 |
| Petitioners, | (Super. Ct. No. BC363201) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| DEEPAK KALPOE et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  William A. MacLaughlin, Judge. Petition granted in part and denied in part.

Jackson Walker, Charles L. Babcock and Nancy W. Hamilton; Ford, Walker, Haggerty & Behar, William C. Haggerty and Neil S. Tardiff for Petitioners.

No appearance for Respondent.

Cremer, Spina, Shaughnessy, Jansen & Siegert, Kristina M. Beck, William J. Cremer (pro hac vice), Joshua D. Yeager (pro hac vice) and I. Brian Marquez (pro hac vice); Girardi Keese, Thomas V. Girardi and Graham B. Lippsmith for Real Parties in Interest.

_____

Petitioners Phillip C. McGraw, CBS Television Distribution Group (formerly known as CBS Paramount Domestic Television), and Peteski Productions, Inc. (collectively referred to as petitioners) filed a petition for writ of mandate after the trial court denied their motion in limine to exclude certain evidence. We grant the petition in part and deny it in part.

## FACTUAL BACKGROUND

Real parties Deepak and Satish Kalpoe (individually referred to by their first names, collectively referred to as real parties), residents of Aruba, and a companion, Joran van der Sloot, were the last people seen in the company of Natalee Holloway (Natalee) before she disappeared in May 2005. Natalee was an American teenager from Alabama on a high school trip to Aruba, and had been in a bar prior to leaving with the three men. She has not been seen since that time and no body has ever been recovered.

Real parties were arrested on suspicion of the rape and murder of Holloway on June 9, 2005, and freed on July 5, 2005. They were arrested again in August 2005 and released in September 2005.

Petitioner McGraw is the host of a television show, the "Dr. Phil Show" (hereinafter the Show), produced by Peteski Productions Inc. (Peteski) in association with CBS Paramount (CBS) and broadcast on a national television network.

In the summer of 2005, petitioners hired a private investigator, Jamie Skeeters, to travel to Aruba to investigate Natalee's disappearance. Skeeters arranged to meet with Deepak by representing that he would help exonerate him. During the meeting in August 2005 (the Skeeters interview), Skeeters asked Deepak if he and Satish had sex with Holloway the night she disappeared. Skeeters secretly recorded and videotaped the meeting with Deepak.

On September 15, 2005, petitioners broadcast an episode of the Show which was devoted entirely to Natalee's disappearance. It was the first episode of the 2005 fall television season. The videotape showed that during the Skeeters interview, Deepak indicated that Natalee had sex with him and Satish.

2

After the episode aired, Deepak claimed he had not consented to the videotaping and recording of the meeting, and had not known that Skeeters was recording it. He also claimed that when Skeeters asked if Natalee had sex with him and his brother, he responded "No," shaking his head, and that the videotape played on the Show had been manipulated.

*PROCEDURAL BACKGROUND*

On December 12, 2006, real parties filed a complaint alleging several causes of action against petitioners.[1] A First Amended Complaint was filed on February 22, 2008. It contains causes of action for defamation, defamation per se, invasion of privacy, negligent and intentional infliction of emotional distress, fraudulent misrepresentation and deceit, negligent misrepresentation and deceit and civil conspiracy.

In October 2011, petitioners filed a motion in limine (designated "Motion in Limine No. 11," hereinafter referred to as the MIL) which was entitled "To preclude argument, testimony or other evidence regarding so-called journalistic standards, standards of conduct or ethics or that defendants are guilty of negligence or failed to act as reasonable persons." In their memorandum of points and authorities they argued that because real parties are "limited public figures," the standard of fault is "actual malice" and any evidence of journalistic standards, codes of conduct and ethics would be irrelevant.

Petitioners had previously brought a motion for summary judgment or in the alternative summary adjudication on the issue of whether real parties were public figures. The court denied the motion, finding a triable issue of fact on that issue.

---

[1] Skeeters was employed by Security Consultant Services and they were both named as defendants. Skeeters passed away in 2007, and his wife and executrix of his estate was substituted in as a defendant. In 2009, all claims against Skeeters and Security Consulting were dismissed.

At the August 24, 2012 hearing on the MIL, the parties discussed the summary judgment ruling[2] and petitioners argued the "finding on the public figure" was a predicate to the MIL. The court noted that the public figure issue was a matter of law, but did not think the MIL was the appropriate mechanism. It decided to hold an evidentiary hearing so it could resolve the issue prior to trial. The parties then stipulated to 285 facts (hereinafter referred to as Stipulated Facts) and submitted points and authorities on the public figure issue. They also submitted a list of contested facts.

On November 13, 2012, the court held an evidentiary hearing to consider the public figure issue, as well as considering other pre-trial motions.[3] It received the Stipulated Facts into evidence, heard videotapes of various depositions, and admitted evidence translations of foreign newspaper articles and books about Natalee and the investigation.[4]

On April 2, 2013, the court issued a ruling explaining that the motion in limine was brought to exclude evidence but after holding the evidentiary hearing, it "denied defendants' motion in limine no. 11 as the evidence submitted in support thereof does not establish that the plaintiffs are limited public figures."

Petitioners filed a petition for writ of mandate with this court on May 31, 2013.

On July 1, 2013, we issued an order to show cause to the superior court, directing a written return to be filed by real parties in interest and allowing petitioners to file a reply.

DISCUSSION

Public figures are subject to a heightened burden when they institute lawsuits for defamation. They must prove by clear and convincing evidence that an allegedly

---

[2]    The summary adjudication/ summary judgment motion was made before a different judge.

[3]    Real parties made several motions in limine which were discussed at the same hearing.

[4]    Real parties objected to the books and newspaper articles on relevancy grounds.

defamatory statement was made with "actual malice," that is, with knowledge of falsity or reckless disregard for the truth. (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280.)

Reckless disregard means the publisher "in fact entertained serious doubts as to the truth of the publication." (*St. Amant v. Thompson* (1968) 390 U.S. 727,731.) "Actual malice is judged by a subjective standard; otherwise stated, 'there must be sufficient evidence to permit the conclusion that the defendant . . . had a "high degree of awareness of . . . probable falsity."' (*Harte-Hanks Communications v. Connaughton* [(1989)] 491 U.S. 657, 688.) To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including evidence of motive and failure to adhere to professional standards. (*Ibid*.; see also *Reader's Digest Assn. v. Superior Court* [(1984)] 37 Cal.3d 244, 257-258.)" (*Khawar v. Globe Intern., Inc.* (1998) 19 Cal.4th 254, 275.)

The issue of actual malice is of such constitutional magnitude that it is not entrusted to the trier of fact. Evidence of malice must be independently reviewed by the court so it may determine the constitutional import of a witness's testimony. (*New York Times, supra,* 376 U.S. at p. 285, *McCoy v. Hearst* (1986) 42 Cal.3d 835, 846.)[5]

The rationale for this malice requirement is that public figures have greater access to the channels of effective communication and therefore have a more realistic opportunity to counteract false statements than private individuals. The state interest in protecting the more vulnerable private individual is therefore greater. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 344.)

---

[5] Petitioners initially framed the MIL to exclude evidence of journalistic standards. Evidence of failure to follow professional journalistic standards by itself does not constitute actual malice. (*Fletcher v. Mercury News* (1989) 216 Cal.App.3d 172, 187.) Even a showing of an extreme departure from journalistic standards alone is an insufficient basis for finding actual malice, although such evidence may be admissible to show actual malice. (*Harte-Hanks Communications v. Connaughton, supra,* 491 U.S. at p. 665.) The question is not whether the reporting standards are fair but whether the author believed the articles were untrue. "Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which has never commanded a majority of this Court." (*Id.* at p. 666.)

5

Whether a person in a defamation action is a "public figure" is determined by federal law (see *Rosenblatt v. Baer* (1966) 383 U.S. 75, 84; *Ghafur v. Bernstein* (2005) 131 Cal.App.4th 1230, 1237), and it is a question of law for the trial court. (*Reader's Digest Assn v. Superior Court, supra,* 37 Cal.3d at p. 252.)

"On appeal, the trial court's resolution of disputed factual questions bearing on the public figure determination is reviewed for substantial evidence, while the trial court's resolution of the ultimate question of public figure status is subject to independent review for legal error." (*Khawar v. Globe International, supra,* 19 Cal.4th at p. 264.)

A public figure may be characterized as either an "all-purpose public figure," that is, one who has achieved such fame or notoriety that he or she is a public figure for all purposes and in all contexts, or as a "limited purpose public figure."

There are three elements required in order to be considered a limited purpose public figure: (1) A public controversy, that is, the issue was debated publicly and had foreseeable and substantial ramifications for non-participants; (2) voluntary acts through which the person sought to influence resolution of the public issue, that is, the person has attempted to thrust him or herself into the public eye; (3) the alleged defamation is germane to the figure's participation in the controversy. (*Gertz v. Robert Welch, Inc., supra*, 418 U.S. at p. 351; *Reader's Digest Assn v. Superior Court, supra,* 37 Cal.3d at p. 253; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845-846.)

*1. Was there a public controversy?*

"A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. . . . [A] public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." (*Waldbaum v. Fairchild Publications* (D.C. Cir. 1980) 627 F. 2d 1287, 1296; *Ampex v. Cargill* (2005) 128 Cal.App.4th 1569, 1577.)

As indicated in the Stipulated Facts, when Natalee disappeared, the incident became widely publicized because of her American citizenship and her age. The case remained in the news media in Aruba and the United States over several years because no

one was ever found complicit in her disappearance and because her body was never discovered. Thousands of Arubans joined in the search of the island. Deepak, Satish, and van der Sloot also changed their stories over time. The American press had a substantial presence in Aruba and some of them camped out on the doorsteps of real parties' homes. The case then took on international and economic significance when Natalee's family charged the Aruban government was not assisting the investigation. The governor of Alabama urged governors of other states to boycott Aruba. An Aruban task force was formed and members of the task force and the Aruban government travelled to Washington D.C. to make a presentation to a member of Congress about the investigation. The Ambassador of the Kingdom of the Netherlands also contacted the U.S. government regarding the boycott.

Without question, the disappearance of Natalee and the role of the Aruban government in the investigation were subjects of public controversy. Many persons in Aruba and the United States were affected and the ramifications of the crime were felt all over the world.

2. *Was the defamation germane to the controversy?*

Real parties claim that the manipulated videotape of the Skeeters interview played on the Show purportedly established their guilt in the disappearance and/or death of Natalee . Since no one had been convicted of the crime and no theory had been established as to the circumstances of Natalee's disappearance, the Skeeters interview was intended to shed light on the yet unresolved controversy. Petitioners were using the fact that there had been no resolution to attract viewers to the Show, intimating that it had new information on the crime obtained by Skeeters' interview.

Clearly, the alleged defamation was germane to the controversy.

3. *Was there a voluntary act in which Deepak and Satish attempted to thrust themselves into the public eye?*

We now turn to the third prong of the limited purpose public figure test. "[C]ourts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves into the forefront of particular public controversies." (*Reader's Digest*

7

*Assn. v. Superior Court, supra*, 37 Cal.3d at pp. 254-255.) It is sufficient that "'[a plaintiff] attempts to thrust himself into the public eye' (*Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1190) or to influence a public decision (*Okun v. Superior Court* [(1981)] 29 Cal.3d [442,] 451.)" (*Copp v. Paxton, supra*, 45 Cal.App4th at pp. 845-846.)

A court must focus on the nature and extent of the individual's participation in the particular controversy. If a party never discusses the matter with the press and limits his or her involvement to that necessary to defend himself of a contempt charge, the simple fact that these events attracted media attention is not conclusive of the public figure issue. (*Wolston v. Reader's Digest Assn., Inc.* (1979) 433 U.S. 157, 167.) In *Wolston*, the private individual was implicated in a Soviet espionage investigation. He did not respond to a grand jury subpoena and was charged with contempt, but he never discussed the matter with the press. He sued the authors and publishers of a book which named him as a "Soviet agent." The Supreme Court found he was not a public figure for purposes of defamation law because he "limited his involvement to that necessary to defend himself against the contempt charge." (*Id.* at p. 166.)

In *Gertz, supra*, an attorney sued a magazine for libel. He had been associated with a well-publicized case, but took no part in the criminal prosecution, never discussed the litigation with the press and limited his participation solely to the representation of a client in civil litigation. (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 352.) As a result, he was determined to not be a public figure. (*Id*. at pp. 351-352.)

In *Khawar v. Globe International, supra,* 19 Cal.4th 254, a photojournalist who sued a tabloid for defamation was not found to be a public figure. He happened to be standing next to President John Kennedy shortly before his assassination and a tabloid newspaper reported him to be the assassin. He was not found to be a limited purpose public figure because he did not voluntarily elect to become a subject of a controversy which resulted in an increased risk of media defamation and he did not enjoy media access sufficient to prevent resulting injury to his reputation before the publication of the alleged defamatory article. (*Id.* at pp. 267-268.)

8

In contrast, in *Reader's Digest, supra*, the plaintiffs, a drug rehabilitation foundation and its founder, were the subject of a full length movie, four books, and numerous newspaper articles. (37 Cal.3d at p. 255.) They sponsored massive publicity and self-promotion efforts over a period of many years and were deemed public figures for purposes of defamation law. (*Id.* at p. 256.)

"In determining whether a plaintiff has achieved the degree of notoriety and influence necessary to become a public figure in all contests, a court may look to several factors. [Fn. omitted.] The judge can examine statistical surveys, if presented, that concern the plaintiff's name recognition. [Fn. omitted] Previous coverage of the plaintiff in the press also is relevant. The judge can check whether others in fact alter or reevaluate their conduct or ideas in light of the plaintiff's actions. He also can see if the plaintiff has shunned the attention that the public has given him and determine if those efforts have been successful. [Fn. omitted.] At all times, the judge should keep in mind the voluntariness of the plaintiff's prominence and the availability of self-help through press coverage of responses in other words, whether the plaintiff has assumed the risk of reputational injury and whether he has access to the media. No one parameter is dispositive; the decision still involves an element of judgment. Nevertheless, the weighing of these and other relevant factors can lead to a more accurate and a more predictable assessment of a person's overall fame and notoriety in the community. [Fn. omitted.]" (*Waldbaum v. Fairchild Publications, Inc., supra*, 627 F.2d at p. 1295.)

We examine the facts presented in the petition to ascertain whether real parties thrust themselves into the limelight or did anything to draw special attention to themselves or make any attempt to influence the public's perception of their guilt or innocence. Petitioners contend there were several ways in which we can find that real parties thrust themselves into the limelight. They point to (1) real parties' lies to the police and others about their involvement; (2) the interviews given by real parties to the media; (3) the interviews given by their lawyers; (4) the interviews given by their mother; (5) Deepak's filing of a complaint with the Aruban government against Natalee's mother, Beth, after she confronted him; (6) the solicitation of a book deal with a literary agent; (7)

9

the filing of a complaint by Deepak and Satish against the Aruban government as a result of the invasion of privacy due to the criminal prosecution; and (8) the numerous news articles and television broadcasts involving the story of Natalee's disappearance.

### a. Holiday Inn Lie

Petitioners refer to a story fabricated by real parties and their companion van der Sloot immediately after Natalee's disappearance in order to "thwart and confuse the police investigation." Real parties refer to the story as the "Holiday Inn Lie." Real parties admit that they and van der Sloot agreed to tell the story that they were driving around and arrived back at the Holiday Inn in the early morning hours, where Natalee was helped out of the car by a security guard. The story varied in some details, but was generally repeated for the first 11 days of the investigation to the police, and other parties.[6] Holiday Inn security guards were arrested and released. The story was later discovered to be a fabrication after review of hotel videotapes and Satish admitted they had lied. Once real parties and van der Sloot were arrested, the stories changed multiple times.

The fact that Deepak, Satish and van der Sloot deliberately told lies to the police about the events which transpired in relation to Natalee does not constitute a voluntary attempt to thrust themselves into the limelight. Neither does the fact that these lies were widely reported by the press.

A person should not be considered a "public figure" solely because he or she is a criminal defendant or has sought certain relief through the courts or merely happens to be involved in a controversy that is newsworthy. (*Reader's Digest, supra*, 37 Cal.3d at p. 254, citing *Wolston v. Reader's Digest Assn. Inc., supra,* 443 U.S. 157 and *Time, Inc. v Firestone* (1976) 424 U.S. 448.)

---

[6]     Petitioners also claim that real parties repeated the Holiday Inn lie to family and friends. The record establishes only that family members were present when they were first questioned by police. The only friend to whom they repeated the story (other than van der Sloot) was to a stranger Deepak met in an internet café.

Many criminals are either evasive or tell lies when confronted by investigators seeking the truth. These lies are usually an attempt to avoid imprisonment or other harsh consequences, not to seek publicity. In this case, we can only conclude from the record that the agreement to tell the Holiday Inn Lie was only an effort to avoid punishment, which was sure to be harsh. The fact that the media reported these stories and other aspects of the investigations does not make it an attempt by real parties to garner publicity. There is no evidence that the three told this story in press conferences or interviews, only to authorities investigating Holloway's disappearance.

### b. *Media articles/TV shows*

Petitioners list and include in the record many news articles about Natalee's disappearance from American and Aruban media as well as transcripts and compact discs of broadcasts on television and news programs. The sheer numerosity of these articles proves that the disappearance and investigation were matters of public controversy, but do not demonstrate that real parties voluntarily sought to inject themselves into the limelight. Without anything more, the suspicion of real parties' involvement and the vast speculation about the crime do not establish they were limited purpose public figures. (*Wolston v. Reader's Digest Assn. Inc., supra,* 443 U.S. at p. 167.)

### c. *Real parties' litigation*

In August 2005, Beth Holloway Twitty, Natalee's mother (hereinafter referred to as Beth), confronted Deepak at his place of work and the media reported on this. Deepak filed a complaint against her with Aruban authorities.

Both Deepak and Satish also filed a complaint against the Aruban government in 2008, alleging invasion of privacy by the media as a result of the criminal prosecution.

We do not find that the lawsuit filed by real parties against the Aruban government and the complaint filed by Deepak against Beth constitute actions which indicate real parties were limited purpose public figures. Their use of the Aruban legal system is their right and does not necessarily show an attempt to use the limelight to their advantage. In addition, the record is clear that the lawsuit against the Aruban government was filed several years after the Skeeters interview.

11

d. *Interviews given by real parties and book deal*

In addition to the general media coverage of the disappearance and investigation, we must also consider, however, real parties' participation in media interviews.

The parties stipulated that Deepak spoke to Greta van Susteren of Fox News in July 2005,[7] and then to Clint van Zandt of MSNBC on August 19, 2005.[8] The Skeeters interview, during which the alleged defamation occurred, was conducted in August 2005 and was broadcast on September 15, 2005.

It is also undisputed that real parties' attorneys spoke to the media on several occasions. On June 28, 2005, Deepak's first lawyer, Rudy Oomen, interviewed with van Susteren. Deepak's second lawyer, David Kock, who also represented Satish, had an interview with van Susteren on June 28, 2005, in which he asserted that Deepak and Satish were now telling the truth while van der Sloot was not. Kock was quoted in an article on CNN.com and appeared on a CNN show. After real parties were released from jail in July 2005, both Kock and Oomen were interviewed. Kock was shown answering questions on the courtroom steps on an MSNBC show on July 12, 2005, and was interviewed by telephone on another show on August 11, 2005. He appeared on a Fox News program with van Susteren on August 3, 2005.

On August 23, 2005, Kock again appeared in a news interview with Van Susteren. Oomen was also quoted in an August 10, 2005, article in the Aruban newspaper Diario.

Finally, petitioners cite numerous interviews given by real parties' mother, Nadira Ramirez. Ramirez consented to several interviews with van Susteren and others.

---

[7]     The Stipulated Facts indicate that Deepak met with van Susteren for about 15 minutes in his mother's home off camera and on July 7, 2005, van Susteren published a blog regarding that conversation. Satish was apparently home but sleeping at the time.

[8]     On an MSNBC August 19, 2005, interview, van Zandt reported that he had just talked to Deepak about his future  But van Zandt said he encountered him in an internet café, and Deepak said, "I am really not supposed to talk about this."  He also said "If I go on these television shows, everybody says I'm a liar."

12

We discuss the impact of these interviews in conjunction with the efforts to market a book.

On July 31, 2005, Deepak admitted in an internet chat with an unidentified female (Wendy Terry) he received numerous offers to tell his story, and had been trying to find a book deal. This chat occurred before the Skeeters interview. After the Show was broadcast, Deepak spoke several times with Larry Garrison, a literary agent. He also corresponded with Garrison by email in December 2005. Deepak prepared a book proposal sometime before January 12, 2006. Satish knew Deepak talked to Garrison and expected half of the proceeds.

We agree that the interviews given by real parties' mother, Ramirez, do not support the argument that they are limited purpose public figures. There is nothing in the record which shows that they urged her to conduct the interviews or even consented to them.

In contrast, however, we find the fact that real parties and their lawyers consented to numerous interviews demonstrates they have attempted to use the media to thrust themselves in the limelight. Deepak clearly consented to speaking with the press as demonstrated by his interviews with van Susteren and van Zandt.

The Skeeters interview, broadcast on the Show, in which the alleged defamation occurred, also demonstrates the use of the media by real parties to thrust themselves into the limelight. Skeeters told Deepak he was an agent of the Show and that Dr. Phil was "popular and powerful." By expressly agreeing to participate in a taped interview to be used in a production for a broad public audience, Deepak voluntarily and affirmatively injected himself into a public discussion about his innocence. Deepak claims he did not know Skeeters was recording the interview. While Deepak argues that the Skeeters interview was manipulated, there is no dispute that he knew he would receive publicity from the interview. In addition, the pursuit of a book deal demonstrates real parties were attempting to profit from their notoriety.

Real parties contend their counsels' contacts with the media were never explicitly authorized and were simply in response to grave accusations of criminal conduct.

13

However, neither Satish nor Deepak stated they forbade their attorneys from speaking to the press or that the interviews were without their consent. Both Deepak and Satish admitted they were satisfied with counsels' performance. Deepak admitted he knew his attorneys were speaking publicly about the matter. In line with the general proposition that statements of an agent made within the scope of the agency are imputed to the principal (*Garlock Sealing Technologies LLC v. NAK Sealing* (2007) 148 Cal.App.4th 937, 964), knowledge of an attorney is imputed to his or her clients. (*Stalberg v. Western Title Insurance Co.* (1991) 230 Cal.App.3d 1223, 1231.) In this case, the Stipulated Facts establish that Deepak knew about the interviews and neither Satish nor Deepak objected to anything their attorneys had done, so we can conclude the attorneys were acting within the scope of their representation. The attorneys' readiness to speak to the media may likely have been an effort to gather public support for real parties and may likely have affected real parties' attempts to profit from the publicity.

We agree that real parties are unlike the plaintiffs in *Reader's Digest* who engaged in massive public relations efforts. But they are not the equivalent of the plaintiffs in *Gertz*, *Khawar*, and *Wolston* who never interviewed with the press. Real parties' lawyers gave interviews, Deepak spoke to reporters, and Deepak pursued a potentially profitable book deal. Deepak agreed to be interviewed for a popular American television show. Taken together, these factors demonstrate they were using their notoriety and access to the media to argue their case and to benefit financially.

Real parties contend they were merely responding to false accusations, relying on *Foretich v. Capital Cities/ABC, Inc.* (4th Cir. 1994) 37 F.3d 1541 in support of their arguments that even public statements and press interviews do not transform someone into limited purpose public figures. In *Foretich,* a child of a divorced couple was the subject of a bitter custody dispute. The mother of the child accused the child's paternal grandparents and the child's father of physical and sexual abuse. The child's mother brought a civil action seeking damages and an end to the father's visitation rights. The father and paternal grandparents, the Foretiches, filed counterclaims for defamation. A jury returned a verdict against the mother on the abuse claims and claims against the

14

father and the Foretiches on defamation were unfounded. Although the verdicts were reversed in part and remanded, the case was never retried. (*Id.* at p. 1544.) No criminal charges were ever filed. The mother hid the child and was incarcerated for contempt during the period from August 1987 to September 1989. (*Ibid*.) The mother and father then embarked on public relations campaigns and many media broadcasts and publications discussed the case. During and immediately after the mother's incarceration, the Foretiches agreed to several newspaper and magazine interviews, attended press conferences on behalf of their son and appeared on two television shows, refuting the allegations of abuse and alleging that the mother was mentally unstable. (*Id.* at p. 1545.)

Several years later, in 1992, a television station, ABC, aired a made for television movie of a dramatized and somewhat fictionalized account about the child custody dispute. At one point during the show, the Foretiches, were called "abusers." They sued the television station, and its producers and broadcasters in federal district court. The defendants, as here, filed a motion in limine requesting a finding that the Foretiches were limited purpose public figures, and the district court denied the motion.

The Fourth Circuit found that there was a public controversy because the custody dispute had ramifications beyond the immediate participants and raised social awareness of child abuse allegations. (*Foretich v. Capital Cities/ABC, Inc., supra,* 37 F.3d at p. 1555.) More importantly, however, it determined that the Foretiches did not become limited public figures by their participation in public comments and media broadcasts because they were simply responding in a reasonable way to harmful accusations. "Therefore, we hold that a person who has been publicly accused of committing an act of serious sexual misconduct that (if committed in the place of publication [fn. omitted] and proved beyond a reasonable doubt) would be punishable by imprisonment cannot be deemed a 'limited-purpose public figure' merely because he or she makes reasonable public replies to those accusations. [Fn. omitted]." (*Id*. at p. 1558.) The court then determined that the Foretiches' replies were reasonable, that is, responsive to the attack, proportionate and not excessively published. (*Id.* at p. 1560.) It concluded: "We see no

15

good reason 'why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from defamation.' [Citation.]  By allowing the Foretiches to defend their good names without succumbing to public-figure status, we protect not only their own interests in reputations, but also society's interest in free speech.  Further extending the *New York Times* actual-malice standard here would serve only to muzzle persons who stand falsely accused of heinous acts and to undermine the very freedom of speech in whose name the extension is demanded.  By freely permitting the Foretiches to respond to [the mother's] charges against them—charges that have never been proved in any court of law—we foster both the individual interest in self-expression and the social interest in the discovery and dissemination of truth—the very goals that animate our First Amendment jurisprudence." (*Id.* at p. 1564.)

Foretich articulates five factors in determining whether a person is a private person or a limited purpose public figure.  Those factors are (1) whether the plaintiff had access to channels of effective communications; (2) whether the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) whether the plaintiff sought to influence the resolution or outcome of the controversy; (4) whether the controversy existed prior to the publication of the defamatory statements; and (5) whether the plaintiff retained public-figure status at the time of the alleged defamation.  (*Foretich v. Capital Cities/ABC, Inc., supra,* 37 F.3d at p. 1553.)  The defendant bears the burden of proof on all five elements.  (*Id.* at p. 1558.)

Foretich adds an additional consideration to the limited public purpose public figure inquiry; that is if the content of a defamatory statement involves a subject that state law has traditionally considered to be defamatory per se,  the plaintiff does not become a limited purpose figure solely by making reasonable public replies to the statement. (*Foretich v. Capital Cities/ABC, Inc., supra,* 37 F.3d at p. 1558.)

Real parties' interviews and the interviews given by their lawyers cannot be equated to the efforts used by the Foretiches.  Real parties admitted they had been with Natalee shortly before her disappearance.  It was not just an accusation made without

16

supporting facts.  Their stories changed multiple times, so it was not merely an effort to vindicate themselves from false charges.  Their actions went far beyond what would be considered a reasonable public reply.

*Time Inc. v. Firestone, supra*, 424 U.S. 448 makes it clear that voluntary discussions with the press do not automatically establish that a plaintiff has thrust himself or herself to the forefront of a public controversy.  (*Id.* at p. 454, fn. 3.)  Rather, the focus should be on whether the plaintiff has attempted to influence the merits of a controversy or drawn attention to himself or herself in order to invite public comment.  (*Ibid.; Wolston v. Reader's Digest Assn. Inc., supra,* 443 U.S. at p. 168.)

"Responding to press inquiries or attempting to reply to comments on oneself through the media does not necessarily mean that a person is attempting to play a significant role in resolving a controversy.  See *Time, Inc. v. Firestone* [(1976)] 424 U.S. 448, 454 n.3." (*Waldbaum v. Fairchild Publications, Inc., supra*, 627 F.2d at p. 1298, fn. 31.)

Real parties were thrust into the public light by virtue of their encounter with Natalee in the hours before her disappearance.  They were questioned and told a lie, which further caused controversy.  This situation is not like *Foretich* where accusations were leveled in response to a custody dispute.  It is true that they did not actively seek out press interviews or hold news conferences but when asked, Deepak consented; they did not shun limelight but certainly had access to media outlets to publicize their side of the story.  Deepak also sought out a book contract prior to the broadcast of the Show.  Deepak's statements to Wendy Terry reflect his belief that there was a continuing public interest in his story and that he could market it for financial gain.  These actions, considered together, can be interpreted as voluntary acts designed to draw special attention to or influence the public perception of guilt.

g.  *Difference between Deepak and Satish*

Real parties also argue that there is a distinction between Deepak and Satish.  We agree.  According to the Stipulated Facts, Satish did not talk to reporters van Susteren or van Zandt.  Satish did not speak to Skeeters.  Satish did not seek out a book deal,  Satish

17

did not say he knew about interviews his attorney was giving.  For these reasons, we decline to find Satish was a limited purpose public figure.

*DISPOSITION*

The petition is granted in part and denied in part.  Let a peremptory writ of mandate issue directing the respondent Los Angeles Superior Court to vacate the portion of its order of April 2, 2013, which denied petitioners' Motion in Limine #11 as to real party Deepak and to enter a new and different order granting that motion as to Deepak to the extent the motion asks that the court find him a limited public figure, and to conduct further proceedings not inconsistent with this opinion.  Petitioners are to recover their costs in this writ proceeding.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18