Filed 4/15/14  Thieriot v. The Wrapnews CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ELISABETH THIERIOT, | B245022 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC484687) |
| v. | |
| THE WRAPNEWS INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Barbara M. Scheper, Judge.  Reversed.

Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor, Stanton L. Stein, Maribeth Annaguey, Ashley R. Yeargan; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Appellant.

Sidley Austin, Frank J. Broccolo, Wesley R. Montalvo and Stephen G. Contopulos for Defendants and Respondents.

This is an appeal from a judgment entered after the granting of a special motion to strike the defamation complaint filed by plaintiff Elisabeth Thieriot against defendants The Wrap News Inc. (hereafter, TheWrap, erroneously sued as The Wrapnews Inc.) and Steve Pond. Thieriot contends that the so-called anti-SLAPP statute, Code of Civil Procedure section 425.16 (hereafter, section 425.16), does not apply to her causes of action for defamation and false light invasion of privacy because those claims do not arise from protected activities as defined in the statute. She also contends that even if section 425.16 applies, she demonstrated a probability of prevailing on her claims. We need not determine whether section 425.16 applies, because we conclude Thieriot presented sufficient evidence to show a probability of prevailing. Accordingly, we reverse the judgment.

## BACKGROUND

Thieriot's causes of action for defamation and false light invasion of privacy arise from an article, written by Pond, that was published on TheWrap's website, thewrap.com, on May 9, 2012. Headlined "Mayan Mystery: Doc Financier Accused of Fleeing With Film Footage (Exclusive)," the article stated that a documentary -- titled "Revelations of the Mayans 2012 and Beyond" -- "has descended into disarray, with its executive producer [subsequently identified as Thieriot] accused of fleeing with two dozen hard drives and 10 computer towers containing the film's footage, according to documents obtained by TheWrap." Pond wrote that according to the documents TheWrap obtained, Thieriot "filmed without a valid permit on federal ground in Mexico and fled with the footage." The article went on to say that "[t]he documents are based on complaints filed by the film's producer, Raul Julia-Levy," and quotes Julia-Levy stating that Thieriot "'ran away with the footage. . . . She was informed not to leave the country, but she did.'" Although the article noted that questions have been raised about Julia-

2

Levy's identity -- and provided links to a 2005 New York Times article and a 2007 Los Angeles Times article that it said "cast[] doubt on Julia-Levy's identity" -- it stated that Julia-Levy provided TheWrap with his birth and baptismal certificates.

Five days later, Thieriot filed the instant lawsuit against TheWrap and Pond. The complaint alleges that the article explicitly and/or implicitly accuses Thieriot of fleeing Mexico in violation of a government order, stealing footage and equipment related to the documentary, and filming on federal ground in Mexico without authorization. The complaint alleges these accusations are false, and the documents and the article are based solely on false claims by Julia-Levy. Thieriot alleges that TheWrap published the article "despite receiving information, prior to publishing it, that Julia-Levy is not credible and has a well-publicized history of making false statements of fact to governmental agencies," and despite a request by Thieriot's representative for time to allow him to investigate and provide further facts and documents to Pond before posting the article. Finally, the complaint alleges that the accusations set forth in the article have been repeated and republished in various media throughout the world, and have resulted in headlines that Thieriot is "wanted" in Mexico.

A.    *Defendants' Special Motion to Strike*

Defendants filed a special motion to strike the complaint. They argued that section 425.16 applies to Thieriot's complaint for four reasons: (1) the article at issue addresses a criminal investigation, which defendants contended constitutes an issue of public interest; (2) the article "addresses a dispute between two persons of notoriety," in that both Thieriot and Julia-Levy are "routinely featured in the press"; (3) the article addresses a documentary regarding the Mayan culture and prophecies about the year 2012, which is of interest to the public; and (4) the article attracted widespread interest, as demonstrated by the complaint's allegation

3

that several other media outlets republished the account set forth in the article. Defendants also argued that Thieriot could not establish a probability of prevailing on her claims because (1) the article is privileged under Civil Code section 47, subdivision (d); (2) Thieriot is a limited purpose public figure, and cannot show by clear and convincing evidence that defendants published the article with actual malice; (3) even if Thieriot were not a public figure, she cannot establish that defendants published negligently; and (4) Thieriot cannot establish she is entitled to damages.

In support of their motion, defendants submitted, among other things, a declaration from Pond, the author of the article. Pond declared that he had been introduced to Julia-Levy by a respected entertainment publicist sometime before August 2011, when Pond wrote the first of five articles about the documentary entitled "Revelations of the Mayans 2012 and Beyond." Julia-Levy provided Pond with information for all of the articles. Pond stated that, "[a]lthough some readers disputed Julia-Levy's claims about the origins and history of the Mayan people, prior to the publication of the most recent Article [i.e., the article at issue here], [Pond] never received any complaints or learned of any discrepancies in the accounts that Julia-Levy provided respecting the filming of the documentary."

In his declaration, Pond described his investigation prior to writing the article. He received a called from Julia-Levy on April 21, 2012, during which Julia-Levy told him that problems had arisen concerning the documentary and that "further details would be forthcoming." Julia-Levy called again on May 7, and told Pond "he had initiated proceedings against [Thieriot] in Mexico," that Thieriot "absconded" with hard drives and computer towers containing the film footage, that Thieriot had filmed on federal ground in Mexico without a permit, and that Thieriot "'was told not to leave the country, but she did.'" Julia-Levy also gave

4

Pond three documents, written in Spanish, to support his statements. Pond had all three documents translated into English.

The first document appears to be an account of a sworn statement that Julia-Levy gave to the Office of the State Attorney General for the Mexican state of Campeche. According to the English translation provided by defendants in support of their motion, Julia-Levy appeared before an investigative agent from the Office of the Public Prosecutor on April 18, 2012 "for the purpose of confirming and expanding his initial statement." He told the agent, under oath, that the person he hired to recruit the film crew, Eduardo Vertiz Mascareñas, has in his possession all of the equipment Julia-Levy reported was taken without his authorization. Julia-Levy said he was filing a formal criminal complaint against Mascareñas and confirmed "the same complaint" against Thieriot and two others for fraud, breach of trust, and theft.

The second document is a letter on the letterhead of the Instituto Nacional de Antropologia e Historia (INAH), addressed to "ELISABETH THIERIOT. [¶] PRODUCTORA EJECUTIVA: REVELACIONES MAYAS DEL 2012 Y MÁS ALLÁ." (There is no address.) The letter is signed by Ramón Carrasco Vargas, archaeologist, as Director of the Calakmul Archaeological Project. According to the English translation provided by defendants, the letter, which is dated April 19, 2012, states that authority for the use of all material filmed in the archaeological area of Calakmul and on the island Jaina has been withdrawn. The letter also states that no one was authorized to be interviewed in certain areas, and that the audiovisual material recorded by certain people "may not be used and must be handed over as soon as possible." It further states that the filming permits were given to Julia-Levy, and therefore the filming done on the island of Jaina "encroached upon federal lands, which constitutes a serious crime" under Mexican laws. The letter ends with the following: "Finally, it only remains for me to

5

suggest that you advise your legal team and the AMOROMA company in charge of production to deliver this material to Mr. Raúl Julia-Levy, since not doing so would be to violate the previous agreements, generating a complaint in the appropriate courts in Mexico, as well as in the United States."

The third document was described by Julia-Levy as an order from the Criminal Investigations Office of the General Attorney's Offices of the State of Campeche. In his declaration, Pond declared that, based upon his review of the document, "it appeared that the Mexican government was ordering [Thieriot] to appear to provide a statement respecting Julia-Levy's allegations and that the Mexican authorities were looking for and intended to seize the property that Julia-Levy claimed was stolen." He also stated that it "indicated to [him] that [Thieriot] was not supposed to leave the country until she complied with the demands set forth in the [document]." The certified English translation of the document (which is attached as an exhibit to Thieriot's complaint), however, does not comport with Pond's understanding. Instead, it is a letter signed by the investigative agent who took Julia-Levy's statement set forth in the first document -- Angelica Concepcion Hernandez Calderon -- and addressed to Licenciado Renato Sales Heredia, General Attorney of the State of Campeche. The agent states that she has attached copies of certain files "with the purpose of sending it to all General Attorney's Offices of the Mexican Republic so that they provide assistance to this office and order to the corresponding party" that certain proceedings are carried out. Those proceedings are (1) locating Thieriot and other parties "so that they provide their statements with the understanding that once they finish with the proceeding they may leave the facilities of the corresponding Attorney's Office"; and (2) securing the property that Julia-Levy asserted was taken without authorization. In other words, the letter is a request for assistance from other General Attorney's Offices; it is not directed to Thieriot and does not order Thieriot to do anything.

6

Pond declared that based upon his understanding of these documents, he did not doubt the accuracy of Julia-Levy's accusations against Thieriot. Nevertheless, he tried to reach Thieriot "to obtain her side of the story," but he did not get any response. That same day, May 7, 2012, he sent an e-mail to Sheila McCarthy, another person involved in the film. He wrote that he "received some documents alleging that Elisabeth Thieriot has absconded with the footage and has a warrant out for her arrest," and asked McCarthy if she had any information she could share. McCarthy responded by e-mail the next morning. She told Pond that she was "not aware of any 'warrant for her arrest,'" and said that she was told a press release would be issued soon by Stanton "Larry" Stein. She provided Stein's phone number and suggested that he might give Pond the exclusive to the story. She also provided a link to a July 19, 2007 article in the Los Angeles Times regarding Julia-Levy.

Pond declared that he called Stein that same day "but [Stein] refused to speak on the record and would not commit to a specific time for providing any information." Pond stated that, although Stein told him not to trust Julia-Levy and referred Pond to articles raising concerns about Julia-Levy's credibility, Stein "was unwilling to even *generically* deny any of Julia-Levy's allegations on the record or that [Thieriot] had left Mexico." Pond believed that Stein's refusal to deny the allegations on the record indicated that the allegations "had merit."

B.    *Thieriot's Opposition to the Special Motion to Strike*

In opposing defendants' special motion to strike, Thieriot asserted that section 425.16 did not apply because the article did not involve any issue of public interest. Specifically, she argued that (1) a criminal investigation does not necessarily constitute an issue of public interest; (2) a private dispute between two people, even if they are "persons of notoriety," is not a matter of public interest;

7

(3) the public's interest in Mayan culture and prophecies does not make the article about a private dispute a matter of public interest; and (4) subsequent republication of the article's content did not turn the information into a matter of public interest.

Thieriot also argued that even if section 425.16 applied, the motion should be denied because she could demonstrate a probability of prevailing on the merits. To that end, she submitted evidence to show that the express or implied assertions of facts in the article were false and that defendants published the article with actual malice.[1] That evidence included declarations from Thieriot, her attorneys in the United States and Mexico, her executive assistant, several people who had been involved in the filming of the documentary (including archaeologists who work for INAH), and Alan Michael Brain Delgado (Brain), a documentary filmmaker who also is an independent journalist.

In her declaration, Thieriot described how she got involved in the project and the formation of a production company with Julia-Levy (R & E Productions, LLC), in which she is the sole Investment Member, owning 100 percent of the investment and assets of the company. She discussed the planning for shooting the documentary, and problems that arose as a result of Julia-Levy's actions. In describing the events that led to the termination of filming on the documentary, Thieriot conceded that she received from Julia-Levy a copy of the third document Pond described in his declaration – the letter from investigative agent Angelica Concepcion Hernandez Calderon addressed to Licenciado Renato Sales Heredia, General Attorney of the State of Campeche – on the day after it was written. She declared, however, that she never received any communications from any governmental officials or authority in Mexico or Guatemala, or any order to appear

---

[1] Thieriot did not in her opposition challenge defendants' assertion that she is a public figure for purposes of her defamation claim, but reserved the right to challenge that assertion at trial.

8

or remain in either country or to turn over any equipment. Finally, Thieriot stated that, as a result of the article posted by Pond and TheWrap, she has lost at least one significant business deal and her ability to raise money on behalf of charitable organizations with which she is involved has been negatively impacted.

Jose Agustin Anaya Cancino and Adriana Iveth Sanchez Lopez, two archaeologists who work for INAH and were hired by the documentary to speak about various topics, submitted declarations stating that no archaeologist – including Ramón Carrasco Vargas, the purported author of the second document Pond described in his declaration – has the authority to withdraw permission that INAH has given to visit or film at any location. In addition, Cancino stated that he had never seen an email, purportedly sent by him, that Julia-Levy forwarded to Thieriot.

The declarations of Eduardo Vertiz Mascareñas, the executive producer of the Mexican and Guatemalan units of the documentery, and Emiliano Chaparro, the director of photography, described some of the events that took place before and during the shooting of the documentary, and stated that the equipment Julia-Levy claimed had been stolen had been either purchased or rented by R & E Productions. Mascareñas also declared that they had all required permits while they were filming, and they did not go onto Jaina Island to film, and Chaparro declared that when Julia-Levy brought the police to his hotel room to seize the filming equipment Julia-Levy claimed was his, the police declined to do so.

Thieriot's executive assistant, Hernan Horacio Mendez, who reviewed the bank statements for R & E Productions and receipts submitted by Julia-Levy, submitted a declaration stating that various equipment that Julia-Levy asserted Thieriot had taken had been purchased using R & E Productions' debit card.

The declaration of Thieriot's attorney in Mexico, Martiz Guadalupe Aguilar Arcique, states that Arcique received a certificate from a person holding the

9

position of Delegate of Centro INAH Campeche confirming there is no record of any administrative proceeding, criminal complaint, criminal proceeding, or civil complaint against Thieriot in the Centro INAH Campeche files.

Thieriot's attorney in the United States, Stanton L. Stein, submitted a declaration describing his conversation with Pond on May 8, 2012, the day before the article was published. Stein declared that he received a telephone call from Pond on the morning of May 8. Pond told him that he was trying to determine what was going on with the documentary. Stein told Pond that he had just been retained by Thieriot, and was still getting up to speed on the case. He "cautioned Mr. Pond that his key, if not only, source, [Julia-Levy] may not be credible and that Mr. Pond and The Wrap should not publish a story based upon [Julia-Levy's] statements alone because doing so could expose them to claims for defamation and false light." Stein also "pointed Mr. Pond to a *Los Angeles Times* article regarding an exhaustive report filed by the Los Angeles District Attorney to exclude [Julia-Levy's] testimony from a criminal case."

Stein also declared that he told Pond "that it is generally not [his] practice to speak on the record unless it is absolutely necessary for the client that [he] do so," but he told Pond he would speak to his client and get back to Pond within a day or two with accurate information about the events. Stein also told Pond that no other publications had contacted anyone "on our side." Pond did not tell Stein that he was under a deadline, or that Stein's offer to get back to him in a day or two would be a problem. Therefore, Stein expected that the article would not be published until after he spoke to Pond. Instead, the article was posted the following morning.

Finally, the declaration of Brain, the documentary film director and independent journalist, described Brain's research into some of the claims made in the earlier articles Pond wrote about the documentary, and Brain's efforts to contact Pond to share the results of that research. Brain first learned of the

10

documentary when he read an article written by Pond and posted on TheWrap's website on September 26, 2011. The article stated that the governments of Mexico and Guatemala were working with Julia-Levy on the documentary, and officials from both governments supported claims that there was evidence of contacts made between the Mayans and extraterrestrials. Brain posted a story about the documentary and Julia-Levy on his online blog about fringe science, alternative history and paranormal activity, losdivulgadores.com.

Brain declared that he began to doubt the authenticity of statements made by Julia-Levy in late October 2011 following "two disturbing reports." The first was an audio interview with Julia-Levy on a Spanish internet radio show, during which Julia-Levy said that statements in Pond's September 26 article about evidence of 3,000 year old landing pads, which were attributed to the Minister of Tourism of Campeche, actually were statements that Julia-Levy made. The second report was an article posted in a Mexican online magazine, De10.mx, on October 11, 2011. Apparently, Julia-Levy provided De10.mx with a photograph that he said was an artifact called "The Mayan extraterrestrial treaty." De10.mx conducted its own investigation and reported that the object in the photograph actually was an artifact called "Estela 19" from the Olmec civilization, and was not related to extraterrestrials. De10.mx posted a letter of apology from Julia-Levy, who admitted that the photograph was not what he originally claimed it was.

Brain posted an article on his blog in late October 2011, explaining the issues raised by the two reports, and began his own investigation of Julia-Levy and the documentary. Brain called Arturo Mendez, the Director de Atencion a Medios del INAH, who told him that neither INAH nor the government of Mexico was involved in the production of the documentary (other than granting permits to film at various locations), and INAH did not support Julia-Levy's statements that he had discovered artifacts confirming extraterrestrial contact with the Mayans. Brain

11

also contacted the Guatemalan National Institute of Tourism (INGUAT) to confirm a statement by its director that appeared in the September 26 article written by Pond. The article had stated that the director of INGUAT said, "Guatemala, like Mexico, home to the ancient yet advanced Mayan civilization has also kept certain provocative archeological discoveries classified, and now believes that it is time to bring forth this information in the new documentary." On November 8, 2011, in response to Brain's inquiry, INGUAT issued a statement that its only involvement with Julia-Levy or the documentary was as mediators to facilitate access to various archaeological sites. The statement also denied that Guatemala had any hidden secrets.

On November 9, 2011, Brain obtained Pond's e-mail address from TheWrap's website and sent an e-mail to Pond advising him of the research he had conducted and the denials by INGUAT and INAH. Brain also contacted Pond through Twitter, telling him about the e-mail he sent. He did not receive a response to his e-mail or tweets.

In December 2011, Brain tried to confirm a statement that appeared in another article written by Pond that was posted on TheWrap on October 26, 2011. Pond wrote in the article that Julia-Levy "passed along a direct quote that, he claimed, came from no less than Stephen Hawking, who he said 'is going to work with us' and will be included in his film." The article stated that "[a]n email sent to a representative for Hawking asking about the authenticity of the quote was not answered." Brain sent an e-mail to Hawking's office, asking about Hawking's involvement in the documentary, and received a response stating that Hawking's office had never heard of the documentary or Julia-Levy, and that Hawking was not involved with either of them.

After TheWrap posted another article by Pond about the documentary on March 27, 2012, Brain sent another e-mail to Pond, advising him of his research

12

and the denials by INGUAT, INAH, and Hawking. Brain also posted on TheWrap's website two comments in the "Comments" section following the March 27, 2012 article, to ensure that his messages reached Pond. He did not receive any response to his posts or e-mails.

## C.    *The Trial Court's Ruling*

The trial court found that defendants' publication of the article was conduct in furtherance of their constitutional right to free speech in connection with an issue of public interest. The court found that defendants showed "that the article discussed criminal accusations against [Thieriot], that [Thieriot] and Raul Julia-Levy, the individual making the accusations, are persons of which the public has taken an interest and the subject of the documentary was of public interest." Therefore, the court concluded that Thieriot's claims were subject to section 425.16, and the burden shifted to Thieriot to show a probability of prevailing on the merits.

The court found that Thieriot failed to meet her burden. The court noted that the article at issue merely reported on allegations made by Julia-Levy against Thieriot and did not state that Thieriot had been charged with any crime. Therefore, the court concluded that the statements in the article were not false, and there was "nothing in the specific language or the tenor of the article that insinuates that defendants believe that [Julia-Levy's] accusations are true."[2]

---

[2]    The trial court rejected defendants' assertion that the statements in the article were privileged under Civil Code section 47, subdivision (d), noting that Thieriot presented evidence that there were no official proceedings against her in Mexico, and the extent of the Mexican government's investigation of the matter, if any, is unclear.

13

The trial court granted defendant's special motion to strike and dismissed the complaint. Thieriot timely filed a notice of appeal from the order granting the motion and dismissing her complaint.

## DISCUSSION

A. *Law Governing Special Motions to Strike*

"Section 425.16 provides an expedited procedure for dismissing lawsuits that are filed primarily to inhibit the valid exercise of the constitutionally protected rights of speech or petition. . . . [¶] A special motion to strike a complaint under section 425.16 involves two steps. First, the moving party has the initial burden of making a threshold showing that the challenged cause of action is one arising from a protected activity. (§ 425.16, subd. (b)(1).) In order to meet this burden, the moving party must show the act underlying the challenged cause of action fits one of the categories described in section 425.16, subdivision (e). [Citation.] [¶] Once the moving party has made the threshold showing, the burden in step two shifts to the opposing party. Under step two of the statutory analysis, the opposing party must demonstrate a probability of prevailing on the claim. (§ 425.16, subd. (b)(1).) A cause of action is subject to dismissal under the statute only if both steps of the anti-SLAPP analysis are met." (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 928.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' [Citation.] However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that

14

submitted by the plaintiff as a matter of law.'  [Citation.]"  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

"[T]o meet his or her burden, the plaintiff need only make a '"sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."'  [Citation.]"  (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1368.)  "An anti-SLAPP-suit motion is not a vehicle for testing the strength of a plaintiff's case, or the ability of a plaintiff, so early in the proceedings, to produce evidence supporting each theory of damages asserted in connection with the plaintiff's claims.  It is a vehicle for determining whether a plaintiff, through a showing of minimal merit, has stated and substantiated a legally sufficient claim.  [Citations.]"  (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 906.)

In the present case, Thieriot challenges the trial court's ruling as to both steps of the anti-SLAPP analysis, i.e., whether the complaint arises from protected activity and whether Thieriot demonstrated a probability of prevailing.  As to the first step, the question whether the published article addressed an issue of public interest is a close one.  We need not answer that question, however, because we conclude that Thieriot produced sufficient evidence to demonstrate a probability of prevailing on her defamation and false light invasion of privacy claims.[3]

B.    *Probability of Prevailing*

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.'  [Citation.]"  (*Taus v. Loftus* (2007) 40 Cal.4th 683,

---

[3]    An action for false light invasion of privacy "is in substance equivalent to a libel [or defamation] claim."  (*Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1133.)  Therefore, we will not separately address Thieriot's second cause of action.

720.)  "[F]alse statements charging the commission of crime or tending directly to injure a plaintiff in respect to his or her profession by imputing dishonesty or questionable professional conduct are defamatory per se."  (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 383.)  "If the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence [citation], that the libelous statement was made with '"actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'  [Citation.]"  (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256 (*Reader's Digest*).)

The parties in this case dispute (1) whether the statements in the article were false; (2) whether Thieriot is a public figure and, if so, whether she produced sufficient evidence to establish actual malice; (3) whether the article was privileged under Civil Code section 47, subdivision (d) (hereafter, section 47(d)); and (4) whether Civil Code section 48a (hereafter section 48a) applies and precludes Thieriot from establishing damages.  We address each issue in turn.

### 1. *Falsity*

"'"'The sine qua non of recovery for defamation . . . is the existence of falsehood." [Citation.]' [Citation.]"  (*Burrill v. Nair*, *supra*, 217 Cal.App.4th at p. 387.)  There is no question that Thieriot presented sufficient evidence that, if believed by the trier of fact, would permit a finding that *Julia-Levy's* accusations against Thieriot were false and defamatory.  Nevertheless, as noted, the trial court here concluded that the *article* was not false because it indicated multiple times that the accusations came from Julia-Levy and did not state that Thieriot had been charged with any crime.  Thieriot contends, however, that "when a news source repeats defamatory charges it is no defense that the news source frames the story as simply reporting that a third party has alleged those charges to be true."  We agree.

16

California has adopted the common law rule that "one who republishes a defamatory statement is deemed thereby to have adopted it and so may be held liable, together with the person who originated the statement, for resulting injury to the reputation of the defamation victim." (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 268.) Although California has limited this rule in some respects by enacting Civil Code section 47, which provides that republication of defamatory statements is privileged in certain defined situations (we address defendants' assertion of privilege in section B.3., *post*), defendants cannot avoid liability simply by stating in the article, even multiple times, that the accusations against Thieriot were made by Julia-Levy.

As our Supreme Court explained more than a hundred years ago, "[i]f A says B is a thief, and C publishes the statement that A said B was a thief, in a certain sense this would be the truth, but not in the sense that the law means. It would constitute no defense to C, for it would be but a repetition by him of a slanderous charge. His defense must consist in showing that in fact B is a thief." (*Gilman v. McClatchy* (1896) 111 Cal. 606, 612; see also *Waite v. San Fernando Pub. Co.* (1918) 178 Cal. 303, 307 ["a defamatory article which would be libelous per se, if its matter was directly stated, does not lose its quality in this regard because it is couched in the form of an interview with another person"]; *Ray v. Citizen-News Co.* (1936) 14 Cal.App.2d 6, 8-9 ["A false statement is not less libelous because it is the repetition of rumor or gossip or of statements or allegations that others have made concerning the matter"].) So it is in this case. The fact that the article merely repeated allegations made by Julia-Levy or described documents based upon those allegations does not resolve the issue of falsity for the purposes of proving defamation. Therefore, the trial court erred in finding that Thieriot did not show a probability of prevailing on the element of falsity.

17

2.    *Malice*

As noted, if the person alleging a defamation claim is a public figure, he or she must "prove[], by clear and convincing evidence [citation], that the libelous statement was made with '"actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' [Citation.]" (*Reader's Digest*, *supra*, 37 Cal.3d at p. 256.) Although Thieriot did not challenge defendants' assertion that she is a public figure in her opposition to defendants' special motion to strike, she does so on appeal. Defendants argue that Thieriot should not be allowed to make such an argument on appeal because it would "deprive [them] of the ability to supplement the record with additional evidence." Although it is unclear what relevant evidence defendants would submit to support their argument, we will assume for the purpose of this appeal that Thieriot is a public figure who must establish actual malice.[4]

We begin by noting that Thieriot was not required to *establish* actual malice by clear and convincing evidence at this early stage of the case. "In opposing an anti-SLAPP motion, a defamation plaintiff need not establish malice by clear and convincing evidence, the standard applicable at trial. Rather, the plaintiff must meet her minimal burden by introducing sufficient facts to establish a prima facie case of actual malice; in other words, she must establish a reasonable probability that she can produce clear and convincing evidence showing that the statements were made with actual malice. [Citation.]" (*Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 563.)

---

[4]    Nothing we say in this opinion is intended to imply that Thieriot is or is not a public figure.

18

"[A]ctual malice can be proved by circumstantial evidence. '[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.' [Citations.] A failure to investigate [citation], anger and hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff [citations] -- such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Reader's Digest*, *supra*, 37 Cal.3d at pp. 257-258, fn. omitted.)

In this case, Thieriot presented evidence that defendants relied upon a source -- their only source -- known to be unreliable. Indeed, it is not disputed that defendants were aware that prosecutors from the Los Angeles District Attorney's Office had "filed a 3-inch-thick document [in a different, high-profile, case] assailing the credibility" of Julia-Levy, and contended that Julia-Levy "had a history of making false statements to police and in legal filings." In fact, defendants provided a link in the article at issue here to the Los Angeles Times article that described the prosecutors' filing. Insertion of that link in the article does not necessarily demonstrate an absence of malice, however, because when describing the Los Angeles Times article, defendants ignored its focus on Julia-Levy's lack of credibility generally, and refer to the article only as "casting doubt on Julia-Levy's identity."

Thieriot also provided evidence that another journalist, Alan Brain, sent e-mails and tweets to Pond and/or TheWrap and posted comments in the "Comments" section on the website, before the article at issue here was published,

to warn defendants that claims made by Julia-Levy that were reported by Pond in earlier articles about the documentary were false.[5]

In addition to the evidence that defendants were aware there were reasons to doubt the veracity of Julia-Levy's statements -- which could support a finding of malice (see *St. Amant v. Thompson* (1968) 390 U.S. 727, 732 ["recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports"]) -- Thieriot also presented evidence that defendants failed to reasonably investigate Julia-Levy's claims. For example, Thieriot's attorney, Stein, declared that when he was contacted by Pond, he told Pond that he was not yet up to speed on the facts because he had only recently been retained, but he said he would provide Pond with accurate facts within a day or two, after he had an opportunity to speak with Thieriot. According to Stein, based upon his conversation with Pond, he believed the article would not be published until he got back to Pond with the additional information. Instead, defendants published the article the following morning.[6] "'Although failure to investigate [before publishing] will not alone support a finding of actual malice, [citation], the purposeful avoidance of the truth is in a different category.' [Citation.] '[I]naction,' i.e., failure to investigate, which 'was a product of a deliberate

---

[5] We note that, in his declaration, Pond stated that "prior to the publication of the most recent Article, [he] never received any complaints or learned of any discrepancies in the accounts that Julia-Levy provided respecting the filming of the documentary" and that, to the best of his knowledge, no one else at TheWrap received any such complaints. At this stage of the case, however, before Thieriot has had an opportunity to conduct discovery to determine if there is evidence that Brain's e-mails were received and/or his comments were reviewed, we must accept Thieriot's evidence as true. (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

[6] Once again, for the purpose of reviewing the order granting defendants' special motion to strike, we must accept as true Stein's account of his conversation with Pond. (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

20

decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges' will support a finding of actual malice. [Citation.]" (*Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1048.)

Finally, we note that a reasonable finder of fact could conclude, based upon the translations of the documents that Julia-Levy gave to defendants, that defendants' acceptance of Julia-Levy's account of the documents constituted a reckless disregard of the truthfulness or falsity of his account. First, as noted, the translation of the document described by Julia-Levy as an order from the Criminal Investigations Office of the General Attorney's Offices of the State of Campeche (which Pond referred to in his declaration as the "CIO Directive") is not an order at all, let alone an order directed to Thieriot. Instead, it is a letter requesting assistance from other General Attorney's Offices. Nevertheless, defendants reported that it "orders Thieriot and two others to appear and turn over the hard drives and towers."

Similarly, defendants accepted, apparently without question or further investigation, the authenticity of the letter on the INAH letterhead, purportedly written by archaeologist Ramón Carrasco Vargas. Thieriot presented evidence that no archaeologist, including Carrasco Vargas, has the power to withdraw permission to film or use material filmed under a grant of permission by INAH. Defendants' failure to investigate Carrasco Vargas' authority is particularly troublesome in light of the incongruity of the last paragraph of the letter, in which the archaeologist purports to provide a legal opinion when he "suggests" that Thieriot deliver the filmed material to Julia-Levy "since not doing so would be to violate the previous agreements, generating a complaint in the appropriate courts in Mexico, as well as in the United States."

In short, if the evidence presented is credited, a reasonable trier of fact could find that defendants' acceptance of Julia-Levy's claims was reckless in light of the

21

"obvious reasons to doubt [his] veracity" (*St. Amant v. Thompson*, *supra*, 390 U.S. at p. 732) and defendants' "'purposeful avoidance of the truth'" (*Antonovich v. Superior Court*, *supra*, 234 Cal.App.3d at p. 1048). Therefore, the trial court erred when it concluded that Thieriot did not present sufficient evidence to show a probability of prevailing on the issue of malice.

3.    *Privilege*

Defendants argue that, even if Thieriot submitted sufficient evidence to show a probability of prevailing on the issues of falsity and malice, their special motion to strike was properly granted because the article is privileged under section 47(d). We disagree.

Under section 47(d), a privileged publication is one made "(1) By a fair and true report in, or a communication to, a public journal of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued." The trial court found that the section 47(d) privilege did not apply because Thieriot presented evidence that there was no "official proceeding" taking place in Mexico. We agree that this evidence is sufficient to show that the privilege does not apply with regard to the statements in the article about the purported INAH directives.

Defendants argue, however, that the article is absolutely privileged under section 47(d), because Julia-Levy presented criminal charges to the Mexican government to institute proceedings against Thieriot, and there was an investigation of those charges. But a report of Julia-Levy's presentation of charges to the Mexican authorities, standing alone, is not privileged under section 47(d), because that statute protects reports of such charges only when a warrant has been issued, and there is no evidence that a warrant was issued in this instance.

(§ 47(d)(E).)  To the extent defendants assert that the article's report on the investigation is privileged, Thieriot presented evidence that the article was not a "fair and true report" of the investigation, because the article stated that Thieriot was ordered "to appear and turn over the hard drives and towers," and that she was told not to leave Mexico, but Thieriot's evidence shows that no such orders were made.  In fact, Thieriot presented evidence that to the extent the Mexican police conducted an investigation, they apparently concluded that Julia-Levy did not have a claim to the filming equipment he asserted was his, because the police declined to seize it.  Therefore, based upon the evidence submitted in connection with the special motion to strike, we conclude, as did the trial court, that the statements in the article are not privileged under section 47(d).[7]

### 4.  *Application of Section 48a*

Section 48a provides in relevant part:  "In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided."  Defendants contended below, and contend on appeal, that because Thieriot did not comply with section 48a's requirement to demand a correction and did not properly allege special damages in her complaint, she cannot establish she is entitled to recover any

---

[7]    Similarly, we conclude that the neutral reportage privilege does not apply to the statements at issue, even if Thieriot is found to be a public figure.  The privilege is defined as follows:  "'[W]hen a *responsible, prominent organization* . . . makes serious charges against a *public figure*, the First Amendment protects the *accurate and disinterested reporting* of those charges, regardless of the reporter's private views regarding their validity.'  [Citation.]"  (*Khawar v. Globe Intern., Inc.*, *supra*, 19 Cal.4th at p. 268.)  In the instant case, the charges were not made by a responsible, prominent organization, but rather by a person who has been accused of making false reports to the police.  Therefore, the privilege does not apply.

damages and therefore cannot establish a probability of prevailing on the merits of her claim.[8] We disagree.

By its plain language, section 48a applies only when the defamatory material is published in a "newspaper" or a "radio broadcast." Defendants ask us to interpret "newspaper" to include online publications such as TheWrap. We cannot do so. "[A] reviewing court's 'fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]' [Citations.] The analysis starts by examining the actual words of the statute, giving them their usual, ordinary meaning. [Citation.]" (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1494.)

At the time the statute was enacted in 1931, or amended in 1945, a "newspaper" was understood to mean a publication that was printed on inexpensive paper, often daily. (See *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1460 [construing "newspaper" in California Reporter's Shield law, the court stated: "The term 'newspaper' presents little difficulty; it has always meant, and continues to mean, a regularly appearing publication printed on large format, inexpensive paper"].) Had the Legislature intended the statute to apply to defamatory material published on an online website, it could have amended the statute to say so, or add a statute to include such websites within the definition of "newspaper," as it did when it enacted Civil Code section 48.5 in 1949 to expand the term "radio broadcast" to include both visual and sound radio broadcasting. (Civ. Code, § 48.5, subd. (4).) Since the Legislature has not expanded the meaning

---

[8] The trial court did not address this contention, having ruled that Thieriot could not prevail on her claims because the article was not false.

24

of newspaper to include online publications, we must conclude that section 48a does not apply here, and Thieriot therefore is not limited to special damages.[9]

## DISPOSITION

The judgment is reversed. Thieriot shall recover her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.                    EDMON, J.*

---

[9]    Even if section 48a applied, Thieriot's claims would not be barred because she presented sufficient evidence to meet her burden under section 425.16 to show that she can state and substantiate a claim for special damages. (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 291 ["The plaintiff need only establish that his or her claim has 'minimal merit'"]; *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 738 [section 425.16 "requires only 'a minimum level of legal sufficiency and triability'"].) On remand, she should be allowed to amend her complaint to correct the technical deficiencies in her pleading of special damages.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25